UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CUMBERLAND FARMS, INC., | Case No. 2:10-cv-4658-ADS-AKT |
| Plaintiff, | |
| v. | |
| LEXICO ENTERPRISES, INC. and FRANK KESHTGAR | |
| Defendants | August 26, 2011 |

## REPLY MEMORANDUM IN FURTHER SUPPORT
## OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Cumberland Farms, Inc. ("Cumberland") hereby submits this Reply to

Defendants' Memorandum of Law in opposition to Cumberland's Motion for Summary

Judgment.  In their Opposition, defendants Lexico Enterprises ("Lexico") and Frank Keshtgar

("Keshtgar") concede there are no disputed material facts with regard to Cumberland's motion.

Instead, they advance three legal arguments, none of which has merit. Accordingly, the Court

should grant summary judgment as to liability on both counts, and set up a status conference to

address the one remaining issue regarding the amount of damages.

**I.      Pursuant To The Plain Language Of The Lease,**
        **Lexico Is Liable for Cumberland's Attorneys' Fees**

In their first argument, Defendants take the position that the plain language of the

attorneys' fees provision in Paragraph 19 of the Lease means it only applies when Cumberland

is the plaintiff and takes "affirmative action" by suing somebody.  Under their interpretation,

the provision does not apply when Cumberland is a defendant, even if it is seeking to enforce

its rights under the Lease.  Based on Defendants' theory, the provision applies if Cumberland

initiates a lawsuit against a dealer to protect its rights, but does not apply if it is forced to

protect its rights in a lawsuit brought by a dealer - even though Cumberland would be taking

the same positions and making the same arguments as it would have if it were the plaintiff.  In

another words, according to Defendants, the result would be different even though the two

suits would both involve the same issue (whether Cumberland properly exercised its right to

reasonably withhold consent), and Cumberland would be seeking the same remedy (an order

enforcing that right).  This makes no sense and paragraph 19 draws no such distinction.

Defendants attempt to support their theory by taking selective examples where the word

"enforce" is used in other contexts inapplicable to our situation.  For example, they cite to

International Paper Co. v. Town of Jay, 665 A.2d 998, 1002 (Me. 1995), to suggest "enforce"

means "to compel obedience to or to cause to be executed," but that case involved the scope,

interpretation, and possible preemption of a Maine statute authorizing municipalities to " . . .

adopt and enforce air pollution control and abatement ordinances" - issues completely different

than the one in this case.  Defendants also cite to a portion of the definition in Black's Law

Dictionary, but fail to mention the definition that explains that to "enforce" means "to give

force or effect to."  Black's Law Dictionary, 9th Ed. 2009.

Finally, Defendants' contorted interpretation would lead to absurd results.  If the only

way Cumberland could recover its costs and attorneys fees is to sue before being sued, the

rational response would be to initiate protective declaratory judgment actions - even if it later

turned out that the dealer was never going to sue in the first place!  Even when Cumberland

knows it acted properly and that any lawsuit against it would be meritless, it could never be

sure it wouldn't be sued.  The proper course under Defendants' interpretation would be for

Cumberland to initiate a lawsuit regardless of whether the dealer was going to sue and

regardless of whether there was any actual dispute between the parties.

    The ordinary and only rational meaning of paragraph 19 is that it applies whenever

Cumberland incurs fees "in enforcing its rights and remedies" under the Lease, whether as a

plaintiff or as a defendant.  Defendants, inadvertently, acknowledged this in their brief in the

second sentence of the first full paragraph on page 5 when they state that the Lexico-CFI suits

"sought to enforce provisions from the Lease..."  There is no dispute that Cumberland was

doing exactly that - enforcing its right under the Lease to reasonably withhold consent.

## II.    Cumberland's Claims Did Not Accrue Until Cumberland Prevailed In The Lexico Lawsuits

    Defendants next argue that Cumberland's claims for attorneys' fees are compulsory

counterclaims that Cumberland was required to bring as part of the original Lexico lawsuit.

This argument is also wrong, and ignores the well-established rule set out in the Treatises, the

Federal Rules, and the caselaw:

> A counterclaim that arose from the same transaction or occurrence as the
> primary claim, but did not accrue or mature until after service of the responsive
> pleading (i.e., the answer), is not compulsory in the action.  In order to be
> mature for purposes of the compulsory counterclaim rule, the counterclaim must
> be completely vested at the time the pleader serves the responsive pleading, and
> not merely contingent or likely to arise in the future.

3 Moore's Fed. Prac. § 13.13 (Matthew Bender 3d Ed. 2011).  See also Fed. R. Civ. P. 13(a)

which provides that "A pleading must state as a counterclaim any claim that - at the time of its

service - the pleader has against an opposing party . . ."; Wright, Miller & Kane, Fed.

Practice & Proc.: Civil 3d. § 1411 (2010) (the "exception to the compulsory-counterclaim

requirement necessarily encompasses a claim that depends upon the outcome of some other

lawsuit and consequently does not come into existence until the action upon which it is based

has terminated."). For example, Moore's explains, a claim "that is contingent on the

resolution of another lawsuit not yet terminated at the operative filing time is not a mature

compulsory counterclaim." 3 Moore's Fed. Prac. § 13.13.

Similarly, Cumberland's claims for attorneys' fees were contingent on the resolution of

Lexico's lawsuits, and were not mature claims until the original Lexico suits were decided in

Cumberland's favor. See 4Kids Entm't, Inc. v. Upper Deck Co., 10 Civ. 3386, 2011 U.S.

Dist. LEXIS 58669, *27 (S.D.N.Y. May 31, 2011) (claim for attorneys' fees was denied as

premature where issues relating to the alleged breach of contract had not yet been fully

adjudicated) (copies of unreported cases are attached as Ex. A); Wagner v. Metro. Life Ins.

Co., 08 Civ. 11284, 2011 U.S. Dist. LEXIS 74954, *55-56 (S.D.N.Y. Feb. 28, 2011) (claim

for attorneys' fees in ERISA action was premature and unsustainable where litigant was not yet

able to show success on the merits); Rodriguez v. Bd. Of Educ. Of Eastchester Union Free

Sch. Dist., 620 F.2d 362, 367 (2d Cir. 1980) (attorneys' fees claim was denied as premature

while case was still pending, and could be renewed following adjudication on the merits);

Sound Video Unlimited, Inc. v. Video Shack, Inc., 700 F. Supp. 127, 149 (S.D.N.Y. 1988)

(defendants' claims for attorneys' fees related to allegedly baseless litigation were "inappropriate" and "premature" and were "not properly interposed as a counterclaim in the litigation).

The cases cited in Defendants' Opposition are either easily distinguishable or actually support this well-established rule. For example, at pages 4 and 5, Defendants point to cases that discuss whether there is a logical relationship between the two claims, but they ignore the fact that Cumberland's claim for attorneys' fees was premature at the time Lexico brought its action. Moreover, there is no logical relationship between the claim in Lexico's lawsuit (that Cumberland's withholding of consent was not reasonable) and the claim in this lawsuit (Cumberland is entitled to recover its costs and fees pursuant to paragraph 19 of the Lease). Defendants also refer on page 5 to Interphoto Corp. v. Minolta, 47 F.R.D. 341, 344 (S.D.N.Y. 1969), a case which distinguishes premature claims from a compulsory counterclaim that accrued prior to the commencement of the action, and supports Cumberland's position. Defendants continue to ignore this distinction between premature claims and prior accruing claims in their discussion of Law Offices of Jerris Leonard, P.C. v. Mideast Systems, Ltd., 111 F.R.D. 359 (D.D.C. 1986). Defendants acknowledge in their Opposition that the key point in Leonard was that at the time Mideast filed its answer, the malpractice had already occurred so the claim already existed. In our case, at the time Cumberland filed its answer, any claim for attorneys fees was premature.

Because Cumberland's claims were contingent on the outcome of the litigation initiated by Lexico, they did not accrue until Cumberland prevailed in that litigation.   Therefore Cumberland's claims were not compulsory counterclaims.

**III.   Cumberland's Claim For Attorneys' Fees Is A
Contractual Claim And Is Not Governed by Rule 54(d)**

In their third argument, Defendants misstate the law regarding Rule 54(d)(2). Defendants fail to inform the Court that Rule 54 only applies to petitions for attorneys' fees where such awards are specifically authorized by statute or are discretionary under the common law.  See Wright, Miller & Kane, Fed. Practice & Proc.: Civil 3d. § 2675.1, 2675.2 (2010)).  Rule 54 does "not apply to claims for attorneys' fees [w]hen the substantive law governing the action provides for the recovery of attorneys' fees as an element of damages (i.e., the fees are sought under the terms of a contract)."  10 Moore's Fed. Prac. § 54.150 (Matthew Bender 3d Ed. 2011) (emphasis added); see also Wright, Miller & Kane, Fed. Practice & Proc.: Civil 3d. § 2680 (2010) (Rule 54(d)(2) does not apply to fees that are sought under the terms of a contract).  Specifically, where parties to a contract agree that a prevailing party will be "entitled to collect attorneys' fees incurred in enforcing the contract . . . [then the] contractual attorney fee provision should be enforced according to its terms; the award of fees may be made only as provided in the contract [and] . . . the provisions of Rule 54(d)(2) are inapplicable."  10 Moore's Fed. Prac. § 54.171[1][a].  In such a case - where attorneys' fees are sought pursuant to the terms of a contract - the claim must instead be pursued in a pleading.  Id.

Both of Cumberland's claims for attorneys' fees are based on the terms of contracts between the parties. Cumberland's first count against Lexico is for liability under the Lease, and its second count against Keshtgar is for liability under the Guaranty. Accordingly, both claims are properly pursued in this lawsuit, and would have been improper if brought pursuant to Rule 54(d)(2).

## CONCLUSION

The parties agree there are no genuine disputes of material fact regarding Cumberland's motion. Based on the well-established law set forth in this Reply and in its Motion for Summary Judgment, Cumberland respectfully requests that this Court grant the motion, together with such other and further relief as the Court deems just and proper.

PLAINTIFF,
CUMBERLAND FARMS, INC.


By:   /s/ Paul D. Sanson
      Paul D. Sanson (PS4337)
      Laurie A. Sullivan (LS 0419)
      Shipman & Goodwin LLP
      One Constitution Plaza
      Hartford, CT 06103
      Tel: (860) 251-5500
      Fax: (860) 251-5319
      psanson@goodwin.com
      lsullivan@goodwin.com

      Its Attorneys

## CERTIFICATION OF SERVICE

I hereby certify that, on this 26th day of August, 2011, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Laurie A. Sullivan
Laurie A. Sullivan

# EXHIBIT   A



**4KIDS ENTERTAINMENT, INC., and 4KIDS PRODUCTIONS, INC., Plaintiffs, -against- THE UPPER DECK COMPANY, and UPPER DECK ENTERTAINMENT, LLC, Defendants.**

**10 Civ. 3386 (CM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2011 U.S. Dist. LEXIS 58669*

**May 31, 2011, Decided**

**COUNSEL:** [*1] For 4Kids Entertainment, Inc., 4Kids Productions, Inc., Plaintiffs, Counter Defendants: Evan Stone Rothfarb, LEAD ATTORNEY, Rothfarb Law, PLLC, New York, NY.

For The Upper Deck Company, Upper Deck Entertainment, LLC, Defendants, Counte Claimants: Barry L. Cohen, LEAD ATTORNEY, SorinroyerCooper LLC, King Of Prussia, PA; Renee F Bergmann, LEAD ATTORNEY, Thorp Reed & Armstrong, LLP(Philly'), Philadelphia, PA.

**JUDGES:** Colleen McMahon, United States District Judge.

**OPINION BY:** Colleen McMahon

**OPINION**

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

This action was filed by 4Kids Entertainment, Inc. and 4Kids Productions, Inc. (collectively "4Kids" or "Plaintiffs"). Plaintiffs sue The Upper Deck Company and Upper Deck Entertainment, LLC (collectively "Upper Deck" or "Defendants") alleging breaches of three separate contracts--the Huntik Term Sheet, the Huntik Commercial Production Agreement ("Huntik Production Agreement"), and the Dinosaur King Commercial Production Agreement ("Dinosaur King Production Agree-

ment") (collectively the "Contracts"). They also assert largely duplicative claims sounding in quantum meruit, unjust enrichment, breach of the implied covenant [*2] of good faith and fair dealing, and account stated relating to each of the Contracts.

Upper Deck counterclaims, alleging that Plaintiffs themselves breached the Huntik Term Sheet.

Plaintiffs originally moved for summary judgment on their claims for breach of contract, quantum meruit, unjust enrichment, and account stated as to each contract, as well as for judgment dismissing Defendants' counterclaim.

The 4Kids enterprises have recently advised the Court that they have filed in Chapter 11. As a result, Defendants' counterclaim against them is subject to the automatic stay, and plaintiffs' motion to dismiss the counterclaim cannot be adjudicated. Therefore, that aspect of the motion is deemed administratively closed, without prejudice (I do not intend to keep it open on this Court's list of pending motions).

The automatic stay does not extend to claims brought by the debtors against other parties. *Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998).* Therefore, the Court can and will adjudicate Plaintiffs' motion insofar as it is directed to their own claims.

For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

On a motion for summary [*3] judgment, the Court may search the record and grant summary judgment to either party whose claim has been proved or dis-

proved. *First Fin. Ins. Co. v. Allstate Interior Demolition Corp., 193 F.3d 109, 114-15 (2d Cir. 1999) (quoting Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996)).* Although Defendants did not move for summary judgment, they are entitled to summary judgment dismissing all of Plaintiffs' claims insofar as they relate to the Huntik Production Agreement, because on the undisputed facts, Defendants have fully complied with their obligations under that contract. Defendants are also entitled to dismissal of Plaintiffs' quasi-contract claim relating to the Huntik Term Sheet.

The Court *sua sponte* dismisses Plaintiffs' claims for quantum meruit, unjust enrichment, and account stated relating to the Dinosaur King Production Agreement because those claims merely duplicate the breach of contract claim relating to that contract. Similarly, all three of Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing are dismissed *sua sponte* because New York does not recognize a separate claim for breach of an implied covenant of good faith where a contract exists. [*4] Either the contract's terms were breached or they were not, and "good faith and fair dealing" does not imply any obligation above and beyond the terms of the parties' actual agreement. [1]

1   There is only one motion--Plaintiffs' motion--pending on the Court's list of open motions. In a letter dated December 16, 2010, counsel for Defendants refers to a Defendants' motion for summary judgment, but no such motion appears on the docket sheet. We are unable to contact counsel--the telephone number listed on the docket sheet is a non-working number--and so assume that the letter is in error and that no cross-motion for summary judgment was filed by Defendants.

## THE HUNTIK TERM SHEET

### I. Background and Facts

### A. Contract Terms

In early 2008, Upper Deck and 4Kids entered into a two-year licensing and broadcasting agreement for the Huntik Series, an animated children's television series. The Huntik Term Sheet ("Term Sheet") was executed on February 26, 2008 by representatives of Upper Deck and on March 4, 2008, by representatives of 4Kids. (Newborn Decl. Ex. 1, ¶11.)

Pursuant to the Term Sheet, Upper Deck agreed to license the rights to the Huntik Series to 4Kids for broadcasting within the United States and   [*5] its territories. Id. at ¶¶ 1-5. The agreement required 4Kids to broadcast twenty-six episodes of Huntik ("Initial Epi-

sodes") on the CW Network, id. at ¶¶ 5-6, with an exclusive option to license the TV Rights to any additional episodes during the contract period. Id. at ¶ 9(a). Each time 4Kids exercised this option, the contract term was automatically extended by one year. Id. at ¶ 9(b).

The Term Sheet specified how to format the episodes for broadcast and required Upper Deck to certify compliance with applicable federal broadcasting rules. Id. at ¶¶ 13-14.

4Kids received the exclusive right to exploit the broadcast rights, "including, but not limited to terrestrial free TV, internet, video streaming, cellphone, wireless distribution, DSL, WIMAX, video on demand...." Id. at ¶ 7(a). Additionally, 4Kids was granted the non-exclusive right to create a website promoting Huntik subject to Upper Deck's consent. Id. at ¶ 7(b). In consideration, Upper Deck received $3,846.16 per Initial Episode, up to a maximum of $100,000 if 4Kids executed its option to license additional episodes. [2] Id. at ¶ 8.

2   Plaintiffs licensed broadcast a total of thirty-nine episodes in 2009, for which Upper Deck would   [*6] have been entitled to $150,000.24 had the $100,000 cap not been imposed.

As long as the Initial Episodes were regularly scheduled for broadcast beginning January 2009, then Upper Deck became obligated to pay 4Kids additional revenue. Id. at ¶ 10. The Merchandise Participation provision required Upper Deck to pay 4Kids 12% of the Gross Merchandise Revenue for the term of the contract plus the first six months after the last episode aired. Gross Merchandise Revenue is defined as "all revenue including toys and video games *but excluding trading cards*, less returns and up to 4% in chargebacks, bad debt and credits given to customers." Id. at ¶ 10(d) (emphasis added). After six months, the Merchandise Participation was reduced to 6%, then further reduced to 3%, and ultimately 0% twenty-four months after the final broadcast. Id. at ¶ 10(a).

Upper Deck was obligated to pay separate royalties on the sale of Huntik trading cards. 4Kids was entitled to 3.5% of the gross revenue on the initial $2,500,000 and 4% on revenue above $2,5000,000 (sic) during the contract term and for a period of six months after the final broadcast date. After the six-month mark, 4Kids was entitled to 2% of the gross   [*7] revenues; then 1% at the twelve-month anniversary, and 0% after twenty-four months. Id. at ¶ 10(b). Upper Deck was further obligated to pay 4Kids "an advance against the Trading Card Royalty in the amount of $350,000 (the "Advance")." Id. at ¶ 10(c). The Advance was to be "payable pursuant to the Payment Schedule, and fully recoupable against the

Trading Card Royalty." Id. The Payment Schedule called for a first installment of $175,000 to be paid on or before December 19, 2008, with a second installment due on or before December 18, 2009. Id. at Schedule B.

Finally, Upper Deck agreed to pay 4Kids 25% of gross TV Revenues, defined as "all revenues . . . including, without limitation, license fees, advances, royalties, running royalties, and minimum guarantees from the exploitation in the Territory of the TV Rights to the Series." Id. at ¶ 11. The Term Sheet provided that 4Kids was responsible for collecting the payments and remitting the total amount to Upper Deck, less up to 7% in actual distribution and marketing expenses incurred by 4Kids. Id. at ¶ 11.

As part of the agreement, Upper Deck also entered into a media commitment with 4Kids on the 4Kids TV website and/or 4Kids' Controlled   [*8] Broadcast in the amount of $300,000. Id. at ¶ 12. The Media Commitment became effective at the time the Initial Episodes were scheduled for broadcast. Id.

4Kids was required to deliver quarterly reports setting forth the Gross TV Revenues received from exploitation of the TV Rights accompanied by a check for any amount due Licensor. Id. at ¶ 15(a). During the contract period and for two years thereafter, Upper Deck had the right to inspect, audit and make copies of 4Kids books and records relating to the Huntik Series. Upper Deck had to pay the cost of the audit unless the audit revealed an underpayment of more than 5% of the amount due. Id. at ¶ 15(b).

The Term Sheet included mutual indemnification provisions. The relevant Upper Deck indemnification provision reads:

> [Upper Deck] shall indemnify and hold harmless 4Kids, its affiliates and licensees, and their respective directors, officers, and employees and agents from and against any and all claims, damages, liabilities, costs and expenses, including reasonable outside attorneys' fees, arising from any breach by [Upper Deck] of any of its representations, warranties, duties and/or obligations.

Id. at ¶ 16(b). 4Kids agreed to indemnify   [*9] 'Upper Deck pursuant to the same conditions. Id.

The parties agreed that the "Agreement shall be construed and controlled by the laws of the State of New York." Id. at ¶ 17(c).

Of critical importance to this motion: The parties specifically agreed to be bound by the Term Sheet until such time as a long form agreement could be executed. The relevant provision reads:

> The parties agree to execute a long form agreement on or before April 15, 2008, containing the terms set forth herein in more detail as well as such terms as may be agreed to in writing by the parties after good faith negotiation and that are customary to agreements of this kind (including representations, warranties and indemnities by Licensor and 4Kids). *Until such time as such long form agreement is executed, this Deal Memo shall serve as the binding agreement of the parties.*

Id. at ¶ 11 (emphasis added). The parties never executed a long form agreement. (Bernstein Decl. ¶ 10.)

## B. Implementation of the Contract

On October 2, 2008, 4Kids sent Upper Deck invoice P100456 in the amount of $200,000 ($300,000 for payment of the media commitment less $100,000 credit for the license fee due 4Kids). Id. at Ex. 4. A second invoice LCR017395   [*10] was issued October 10, 2008 in the amount of $175,000 for payment of the Trading Card Advance pursuant to paragraph 10(c) of the Term Sheet. Id. at Ex. 3. 4Kids received a wire transfer in the amount of $375,000 from Upper Deck on December 23, 2008, in payment of the two above described invoices. Id. at Ex. 5.

4Kids began broadcasting the Huntik Series in January 2009. (Newborn Decl. Ex 2.) By December 26, 2009, 4Kids had broadcast thirty-nine episodes of the Huntik Series, including the broadcast of all the Initial Episodes. Id. Since 4Kids was only obligated to show 26 episodes per the original Term Sheet, I infer that plaintiffs invoked their option to license 13 additional episodes; this had the effect of automatically extending the contract term by one year, making its termination date February 26, 2011.

On July 30, 2009, 4Kids issued invoice L108199 in the amount of $175,000 for the second installment payment of the Advance, which was payable on or before December 18, 2009. Id. at Ex. 6. This invoice has not been paid.

During 2009, Defendants allege they never received payments for TV Revenues they were entitled to pursuant to the accounting provision. Nor did they receive the required   [*11] quarterly reports from 4Kids. (Defs.'

Answer & Countered, Docket 9.) 4Kids does not deny failing to prepare and file quarterly reports; rather, it contends that it never received any gross TV Revenues, so there was nothing for it to report.

## II. Discussion

Viewing the record in the light most favorable to the non-moving party, a court may find summary judgment where there is "no genuine issue as to any material fact," and the undisputed facts warrant judgment for the moving party as a matter of law. *Fed. R. Civ. P. 56(c)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citations omitted). Sufficient evidence [*12] must exist upon which a reasonable jury could return a verdict for the nonmoving party. Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson, 477 U.S. at 248*. Summary judgment is warranted when the non-movant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex, 477 U.S. at 322-23*; *Silver v. City Univ. of N.Y., 947 F. 2d 1021, 1022 (2d Cir. 1991)*.

## A. Plaintiffs' Claim for Breach of Contract (Huntik Term Sheet)

Plaintiffs' Motion for Summary Judgment on Count I for Breach of Contract (Huntik Term Sheet) is granted in part (as to liability) and denied in part (as to damages).

The Term Sheet required Defendants to pay Plaintiffs an advance of $300,000 in two installments. Defendants made the first payment, but when the second came due on December 18, 2009, they failed to pay the invoice. Plaintiffs seek summary judgment in their favor for the amount invoiced--$175,000--on the theory of breach of contract.

New York law requires a party claiming breach of contract [*13] to prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000)* (quoting *First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998))*.

4Kids has performed its obligations under the Term Sheet. It broadcast the Initial Episodes on thirty-nine dates during 2009. (Newborn Decl. ¶ 24; Ex. 2.) 4Kids offered evidence that the second half of the Advance was never paid; Defendants fail to controvert that evidence. It would thus seem that summary judgment for Plaintiffs is in order.

Defendants argues that the Term Sheet does not incorporate the parties complete understanding and, as to the Advance, is ambiguous, because the parties intended that the advance under the Huntik Term Sheet was intended to be a loan to be applied against royalties, not a guaranteed payment. The evidence offered in support of this argument qualifies as parol evidence, so the first order of business is to decide whether the Court can consider it.

Where any part of the parties' agreement has been reduced to writing, the parol evidence rule applies. *Laskey v. Rubel Corp., 303 N.Y. 69, 71, 100 N.E.2d 140 (1951)*. [*14] If the writing is incomplete, "parol evidence may be admitted, 'not to contradict or vary, but to complete, the entire agreement, of which the writing was only apart.'" *Id. at 71-72* (quoting *Thomas v. Scutt, 127 N.Y. 133, 138, 27 N.E. 961 (1891))*.

The first step in assessing whether the parol evidence rule applies is determining whether the agreement is integrated. *Investors Ins. Co. v. Dorinco Reins. Co., 917 F.2d 100, 103-05 (2d Cir. 1990)*. An agreement is integrated if it "represents the entire understanding of the parties to the transaction. *Id. at 104*. The absence of a merger clause does not conclusively demonstrate that an agreement is not integrated. See *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc., 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000)*. In such cases, the court must "read[] the writing in light of the surrounding circumstances" to determine whether the parties intended the agreement to be an integrated contract. *Bourne v. Walt Disney Co., 68 F.3d 621, 627 (2d Cir. 1995)*. Under New York law, "a contract which appears complete on its face is an integrated agreement as a matter of law." *Battery Steamship Corp. v. Refineria Panama, S.A., 513 F.2d 735, 738 n.3 (2d Cir. 1975)* (citing [*15] *Higgs v. De Maziroff, 263 N.Y. 473, 478, 189 N.E. 555 (1934))*. "[E]vidence of a very high order is required to overcome the heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties." *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc., 46 N.Y.2d 211, 212-13, 385 N.E.2d 1062, 413 N.Y.S.2d 135 (1978))*.

If the document is integrated, the court must next determine whether the language of the agreement is clear or ambiguous. *Investors Ins., 917 F.2d at 104.* "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990).* Ambiguity is found when the contract language suggests "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England, 136 F.3d 82, 86 (2d Cir. 1998)* (quoting *Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997)).* Ambiguity can arise either from [*16] the language itself or from inferences that can be drawn from the language. Id. Therefore, "only where the language *and* the inferences to be drawn from it are unambiguous" may a district court "construe a contract as a matter of law and grant summary judgment accordingly." Id. (quoting *Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir. 1990)).*

The language and terms of the Term Sheet demonstrate that the agreement is fully integrated. The Term Sheet reflects a licensing agreement between two sophisticated entertainment companies that engaged in extensive negotiation before memorializing their agreement in writing. While the Term Sheet provides for the execution of a long form agreement at some unspecified point in the future, that does not render the Term Sheet a non-integrated contract.

Upper Deck's suggestion that the Term Sheet is simply an "outline" of the relationship between Upper Deck and 4Kids is belied by the detailed and comprehensive nature of the Term Sheet. The Term Sheet sets forth every material contract term: the number of episodes to be broadcast, the format of the episodes, options for acquiring more episodes (which, if exercised, automatically [*17] extends the term of the contract), and a number of sophisticated compensation arrangements, including a merchandise participation provision, media commitment, the allotment of royalties based on TV Revenues and Trading Cards, as well as the Advance Provision. Each compensation provision includes compensation reduction provisions that detail the time frame and percentage of the reduction in compensation. The Term Sheet contains warranties and representations about various matters, including federal regulatory compliance. It contains all the provisions one regularly finds in business contracts, including auditing and accounting details, choice of law and indemnifications. Finally, it concludes with an express statement that the parties agree to be bound by the

Term Sheet until said time as a long form agreement may be signed. All this supports the conclusion that the agreement represents the full understanding of the parties as of the time it was made.

The fact that the Term Sheet contemplates the possibility of a longer and more detailed agreement, "containing the terms set forth herein in more detail *as well as such terms as may be agreed to* in writing by the parties after good faith [*18] negotiation . . ." (Newborn Decl. Ex. 1 ¶ 11) (emphasis added), does not call this conclusion into question. The quoted language demonstrates that the parties expected to continue their negotiations and might add terms to the arrangement that is described in the Term Sheet, but does not suggest either a lack of agreement on the contract's essential terms or any inclination to alter them. Indeed, the language quoted makes it clear that any terms already agreed to would remain the same in any longer agreement that the parties might reach. And "might" is the operative word: The quoted language does not impose on the parties to the Term Sheet any obligation to supplement the terms upon which they were already in agreement; so the fact that they never concluded a longer form of agreement, or agreed to any additional terms, does not affect the integrated nature of the terms on which they were already agreed. The very fact that the parties agreed to be bound by the agreements already reached compels the conclusion that there exists an integrated contract to the extent of what is memorialized in the Term Sheet.

The question thus becomes whether the language of the relevant portion of the Term [*19] Sheet--the provision that provides for payment of a $375,000 Advance against royalties in two installments--is ambiguous. The agreement cannot be varied by parol evidence, so unless the language requires explanation, parol evidence is unnecessary.

An Advance is "the furnishing of money or goods before any consideration is received in return." Black's Law Dictionary (9th ed. 2009). In this case, the payment is specifically identified as an advance against royalties that the parties expected would be earned from the sale of trading cards. When a party to a contract agrees to advance funds in the expectation of payment at a later date, it represents the two sides' agreement as to which one of them will bear the financial risk during the period while the royalties are being earned.

In this case, the parties agreed that Defendants would bear the risk, because Defendants agreed to advance monies to 4Kids against the expectation that it would recoup those monies in the form of royalties. That much is clear and unambiguous--as are the dates when the advances were to be paid. It is unquestionably the case that Defendants failed to make timely payment of

the second advance. Parol evidence is not   [*20] needed to explain any of this.

Furthermore, nothing in the contract suggests that Defendants' failure to pay any specific amount of royalties prior to the due date for the second payment would excuse the making of that payment. The obligation to make the advance payment at a particular time and in a particular amount is contingent on nothing at all.

Therefore, Plaintiffs are entitled to summary judgment on the issue of liability. Defendants unquestionably breached the Term Sheet by failing to pay the second installment of the advance on the date it was due, and they are entitled at the very least to damages representing the time value of that $ 175,000 if it had been advanced as per the contract.

But this Court is going to order Defendants to write Plaintiffs a check for $175,000, plus interest from December 18, 2009. Plaintiffs are not entitled to summary judgment on the issue of damages because there is indeed an ambiguity in the Term Sheet--just not one that relates to whether Defendants should have paid the second installment of the Advance.

Royalties on the trading cards were to have been paid "during the Term in the Territory and for a period of six months from the Last Broadcast   [*21] Date." (Newborn Decl. Ex. 1, ¶ 10(b).) The "Last Broadcast Date" was December 26, 2009; six months after that was June 26, 2010. The Term was initially two years (expiring on or about February 25, 2010) and appears to have been extended for an additional year (until on or about February 25, 2011), since 4Kids broadcast an additional thirteen episodes. Since the Last Broadcast Date was some eight months before the end of the Term (on February 25, 2011), 4Kids was to pay royalties to Defendants through the end of the Term--which expired some three months ago.

A payment recoupable against royalties appears to be the quintessential example of a true advance. But unfortunately, the Term Sheet (unlike prior contracts between the parties) is silent about whether any portion of the Advance that was not recouped via the payment of royalties was to be returned to the Defendants. One might say that such a result is inherent in the very concept of an "advance," but that is not always the case. Advances are treated in various ways depending on the parties and the situation. Indeed, it appears, from parol evidence submitted by Defendants concerning the parties' course of dealing, that in prior trading   [*22] card license agreements between 4Kids and Upper Deck the advance was explicitly tied to a guaranteed minimum royalty, and it was spelled out that the advance would not be repaid to Upper Deck if sales did not reach the specified minimums. (See Bernstein Decl. Exs. D and E.)

Here, the Term Sheet does not contain analogous language, or specify, one way or the other what was to happen to any unrecouped portion of the advance upon the expiration of the contract's Term (which date is set in the Term Sheet).

For that reason, Plaintiffs are not entitled to summary judgment on the issue of damages. There is no reason for this Court to presume that the Advance was intended by the parties to be some sort of guaranteed minimum payment, to be retained by Plaintiffs in the event the trading cards did not generate enough in the way of royalties to repay the Advance in its entirety. However, there is also no reason for the Court to presume that the Advance was to revert to Upper Deck if it was not entirely recouped via royalty payments. This may be a function of industry custom, or the parties' course of dealing (which actually suggests that advances are to be treated as minimum payments).

Therefore,   [*23] Plaintiffs have not yet established that they are entitled to anything other than interest on the sum of $175,000 for the period when that sum should have been in their bank account. Put otherwise, while Defendants are indisputably liable for failing to pay the second installment of the Advance when it was due per the Term Sheet, I cannot at this moment determine to what damages Plaintiffs might be entitled, because of an ambiguity in the contract--not about Defendants' obligation to advance the money in the first place, but about what was to happen with the money advanced after the Term expired, if (as appears to be the case) trading card sales were less than expected.

So Plaintiffs' Motion for Summary Judgment on the theory of breach of contract is granted to the extent of declaring that the contract for payment of the second installment of the Advance was breached on or about December 18, 2009; but is denied to the extent that it seeks to compel payment of the $175,000 at this time. Damages for the breach remain to be calculated.

**B. Plaintiffs' Other Claims Relating to the Huntik Term Sheet are Dismissed**

Plaintiffs assert a number of other claims relating to Defendants' failure to pay   [*24] the second installment of the Advance.

Plaintiffs' Motion for Summary Judgment on the theories of quasi contract (quantum meruit and unjust enrichment) is denied, and these claims (Counts II and III insofar as they relate to the Huntik Term Sheet) are *sua sponte* dismissed.

Under New York law, claims of quantum meruit and unjust enrichment are analyzed together as a single quasi-contract claim. *Mid-Hudson Catskill Rural Mi-*

grant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005). To recover in quasi contract, a plaintiff must establish: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Id. (citing Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000).

A plaintiff may not, however, recover in quasi contract where the parties have a valid, enforceable contract that governs the same subject matter as the claim for quantum meruit. Id. (citing Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987)). A claim for "quasi contract" applies only "in the absence of an express agreement, and   [*25] is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." Id. Since the Huntik Term Sheet is a contract, to which the parties' have expressly agreed to be bound, no claim lies in either quantum meruit or unjust enrichment. Plaintiffs will recover damages on their breach of contract claim, and so will be made entirely whole.

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is also dismissed, sua sponte. "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002) (quoting Fasolino Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)). Plaintiffs' claim for breach of the implied covenant is, therefore, duplicative of Plaintiffs' breach of contract claim. For that reason, Count IV is also dismissed.

An account stated is "'an agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and the   [*26] balance due, if any, in favor of one party or the other.'" Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff, 638 F. Supp. 714, 719 (S.D.N.Y. 1986) (citing Chisholm-Ryder Co., Inc. v. Sommer & Sommer, 70 A.D.2d 429, 431, 421 N.Y.S.2d 455 (N.Y. App. Div. 1979)). A party asserting a claim for account stated must prove it tendered the account and the opposing party did not object within a reasonable time. See Rodkinson v. Haecker, 248 N.Y. 480, 485, 162 N.E. 493 (1928). A party who fails to object within a reasonable time is bound by the account absent fraud, mistake or other equitable considerations. Id.

However, a claim for an account stated "cannot be made an instrument to create liability," nor may it "be utilized simply as another means to attempt to collect under a disputed contract." Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp. Inc., 171 A.D.2d 479, 567 N.Y.S.2d 404 (N.Y. App. Div. 1991)).

4Kids issued Invoice L108199 on July 30, 2009 with a due date of on or before December 18, 2009. (Newborn Decl. Ex. 6.) The Affidavit of Samuel R. Newborn, 4Kids' General Counsel, states "After Invoice No. L108199 remained unpaid, I personally contacted representatives of [Upper Deck] on several occasions regarding the invoice, including   [*27] George Rikos, Corporate Counsel for [Upper Deck] who acknowledged that Invoice No. L108199 had been received, accepted and retained by [Upper Deck]." (Newborn Decl. ¶ 36.) This statement alone does not prove that Upper Deck failed to object to the account. It establishes, at most, that Upper Deck received the account.

Plaintiffs' claim for account stated is congruent with, and duplicative of, its claim for breach of contract for failure to pay the second installment of the Advance due under the Huntik Term Sheet. For that reason, the claim is dismissed.

### C. Plaintiffs' Claim for Attorneys' Fees Relating to the Huntik Term Sheet

Plaintiffs' request for attorneys' fees relating to the Huntik Term Sheet is denied as premature, since the issues relating to their claim for breach of contract are not yet fully adjudicated.

## HUNTIK COMMERCIAL PRODUCTION AGREEMENT

### I. Contract Terms and Facts

On or about February 2009, the parties entered into a Commercial Production Agreement for the production of a thirty second commercial spot with a fifteen second "cut down" (collectively the "commercial spots") to promote the Huntik trading card game ("Huntik Production Agreement"). (Newborn Decl. Ex. 7, ¶ 1.)   [*28] 4Kids assumed responsibility for the production of the commercial spots, including script writing, storyboards, casting, dialogue recording, sound editing, picture conforming, graphics editing, and mixing. Id. Upper Deck provided 4Kids with the music for the commercial spots.

On March 1, 2009, Upper Deck asked for a revision to the commercial spots, the cost of which was not to exceed $2,432.00. (Newborn Decl. Ex. 8.)

On March 31, 2009, 4Kids issued invoice P-100492 in the amount of $2,432.00 to Upper Deck for payment of the revision. Id. Ex 9. Upper Deck contends that it paid the invoice by check dated May 14, 2009. A copy Upper Deck's online account statement from Bank of

America, showing a copy of the front and back of the check (with electronic endorsements of JPMorgan Chase Bank, NA) and also showing the date the check was posted as cashed, is included in the record. (Bernstein Decl. Ex B.) The check is drawn on the account of The Upper Deck Company, LLC, and made payable to 4Kids Productions, Inc. at the address provided on the invoice. The check was posted to Upper Deck's account on May 28, 2009. The bank credited the amount to "Payee AEG." Id.

4Kids sues for non-payment of this [*29] invoice, claiming that it never received payment. But Plaintiffs offer no evidence to support its conclusion that it never received payment. All the evidence is to the contrary. Therefore, not only is Plaintiffs' motion for summary judgment denied, but all of Plaintiffs' claims with respect to the Huntik Commercial Production Agreement are dismissed.

**II. Discussion**

When a party makes a motion for summary judgment, the Court may search the record and grant summary judgment, not just to the moving party, but to any party who may be entitled to it--even if that party has not moved for relief. *First Fin. Ins. Co. v. Allstate Interior Demolition Corp., 193 F.3d 109, 114-15 (2d Cir. 1999)* (quoting *Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996))*.

Here, Defendants have presented unrefuted evidence that they fully and timely paid Invoice P-100492. In response to Plaintiffs' motion for summary judgment, Defendants' produced a copy of a check in the amount of $2,432.00 drawn on Defendants' account at Bank of America and made out to 4Kids Production, Inc. The check was signed by Debra Histad (sic) and dated May 14, 2009. The check was cashed on May 28, 2009 by JPMorgan Chase Bank, NA ("Chase"). [*30] (Bernstein Decl. Ex. B.) Invoice P-100492 clearly identifies Chase as Plaintiffs' bank. (Newborn Decl. Ex. 9.)

On this evidence, a reasonable juror could only conclude that Defendants paid the invoice.

It is theoretically possible that someone other than a 4Kids employee cashed the check, or that Chase deposited the check in the wrong account. But that is not the responsibility of Upper Deck. Once Chase became the holder of the check on behalf of 4Kids, their act of cashing the check satisfied Upper Deck's obligation to pay Invoice P-100492. See *N.Y.U.C.C. Law §§ 3-201, 3-603(2), 3-604(3)*. If the bank made a mistake, Plaintiffs' remedy is to assert a claim against Chase--not against Defendants.

Because all claims relating to the Huntik Commercial Production Agreement depend for their viability on non-payment of the Invoice, and the evidence demonstrates that the Invoice was in fact paid, all of Plaintiffs' claims relating to the Huntik Commercial Production Agreement are dismissed.

## DINOSAUR KING COMMERCIAL PRODUCTION AGREEMENT

### I. Contract Terms and Related Facts

On May 1, 2009, 4Kids began production of a twenty second commercial spot for Upper Deck to adapt a European commercial for American [*31] promotion. (Newborn Decl. Ex. 11.) A Work Authorization Form set forth the production services requested and listed consideration in the amount of $9,701.00. Id. 4Kids produced the commercial spot and delivered it to Upper Deck on May 11, 2009. (Newborn Decl. ¶¶ 75-76.)

On May 14, 2009, 4Kids began production on rush revisions to the same commercial spot, with the cost not to exceed $1,178.00, pursuant to a second Work Authorization Form. (Newborn Decl. Ex. 12.)

The parties executed a final Production Agreement June 2, 2009, detailing the terms of the production contract to adapt the Dinosaur King commercial spot. ("Dinosaur King Production Agreement"). (Newborn Decl. Ex. 10.) The Production Agreement was made retroactively effective as of May 1, 2009. Id. at 1. The agreement specifically provided that 4Kids would develop a commercial spot to promote the trading game based upon an existing commercial produced in Europe. 4Kids was responsible for supervising and coordinating the adaptation, including providing "casting, dialogue recording, sound editing, picture conforming, graphics editing and mixing." Id. at ¶ 1. As consideration, Upper Deck was required to pay 4Kids a production fee [*32] of $9,701.00. Upon execution of the contract, Upper Deck was required to pay 4Kids $4,701. The remaining $5,000 was to be credited to Upper Deck's Media Account, upon delivery of the final commercial spot. Id. at ¶ 5.

This agreement reflected in more detail the terms of the first Authorization form. It did not include the terms set forth in the second Authorization Form, including the $1,178.00 fee for the rush revisions.

The Production Agreement also contained indemnification provisions. Pursuant to the contract, Upper Deck agreed to indemnify 4Kids "against all actions, claims, liabilities and expenses, including reasonable attorneys' fees, arising out of or in connection with the breach by [Upper Deck] of any of the foregoing representations, warranties and obligations, provided that [Upper Deck] is given prompt written notice of any such action or

claim." Id. at ¶ 9(a). 4Kids agreed to indemnify Upper Deck on the same terms. Id. at ¶ 9(b).

Additionally, the Production Agreement contained a merger clause, which provided that this agreement was "the entire understanding and agreement of the parties and supersedes all prior understandings and agreements with respect to the subject matter   [*33] hereof, and any representation, promise or condition not specifically incorporated herein shall not be binding upon either party." Id. at ¶ 11(f).

On June 9, 2009, 4Kids sent Upper Deck an invoice P100504 in the amount of $5,879.00--$9,701.00 for the Dinosaur King commercial spot, less the $5,000.00 offset from the Upper Deck Media Account, plus an additional $1,178.00 for the rush revisions authorized by the Second Authorization Form. (Newborn Decl. Ex. 13.) Upper Deck failed to pay the invoiced amount until 4Kids filed this lawsuit. Payment in the full amount of $5,879.00 was finally made on December 10, 2010. (Bernstein Decl. Ex. C.) 4Kids acknowledges receipt of payment. (Gray Decl. ¶¶ 16-17.) Nonetheless, 4Kids has sued for breach of contract and the other forms of relief discussed above.

## II. Discussion

### A. Breach of the Dinosaur King Commercial Production Agreement

Plaintiffs' motion for summary judgment on Count I, which alleges that Upper Deck breached the Dinosaur King Production Agreement, is granted.

The agreement provided that Upper Deck would pay $4,701 for services rendered on the contract. Plaintiffs completed production and delivered the Dinosaur King Adaptation to Upper Deck   [*34] on or about May 11, 2009. Defendants failed to pay Invoice P100504 in the amount of $5,878.00 issued June 9, 2009 for eighteen months, until eight months after Plaintiffs' filed suit, and only days before its response to Plaintiffs' summary judgment motion was due.

Defendants claim that at least a portion of the invoice was for changes to the spot that were not authorized in writing. Nonetheless, it has paid the invoice in full.

Defendants suggest no reason why it was not liable to pay at least the portion of the invoice that it cannot and does not dispute--$4,701, representing the agreed-upon cost of the commercial ($9,701) less $5,000 credited from the Media Account. And they have paid the entire sum invoiced. Therefore, the only issue remaining is the value of interest on the sum invoiced from the time it was due and not paid until the date judgment

is entered. Paying the invoice in full satisfies Plaintiffs' claim for the principal amount, but does not excuse the failure to make *timely* payment. Plaintiffs are entitled to damages in the form of interest commencing thirty days after the invoice was issued.

Plaintiffs also seek recovery of attorneys' fees incurred in obtaining payment   [*35] of the Dinosaur King invoice--which required the filing of this lawsuit. Needing a contractual provision to overcome the usual rule that each party bears its own attorneys' fees, Plaintiffs point to the indemnification provision in the Dinosaur King Production Agreement, which provides that Upper Deck will hold 4Kids harmless "from and against any and all claims, damages, liabilities, costs and expenses, including reasonable outside attorneys' fees, arising from any breach by [Upper Deck] of any of the foregoing representations, warranties and obligations."

Under New York law, a provision for indemnification of attorneys' fees will be enforced but only if it is unmistakably clear that the parties intended to provide for payment of attorneys' fees relating to disputes between themselves. *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F. 3d 168, 178-79 (2d Cir. 2005).* Where an indemnification provision can be read to encompass claims that could be asserted by a third party, a New York court will hold that the agreement to indemnify for attorney's fees does not unmistakably refer to disputes between the contracting parties, and so will not allow the indemnity agreement   [*36] to serve as a way around the usual rule. *Bridgestone/Firestone, Inc. v. Recovery Credit Service, Inc., 98 F.3d 13 (2d Cir. 1996).* In *Hooper Associates v. AGS Computers, 74 N.Y. 2d 487, 492, 548 N.E.2d 903, 549 N.Y.S.2d 365 (N.Y. 1989),* the New York Court of Appeals read an indemnification clause and observed that the provision's list of potential grounds for claims were all "susceptible to third-party claims, while none was "exclusively or unequivocally referable to claims between the parties themselves." As a result, the court rejected the winning side's attempt to extract an award of attorneys' fees out of the indemnification clause.

The parties have briefed the attorneys' fees issue exclusively with reference to the Huntik Term Sheet, which specifically requires each party to indemnify the other for reasonable attorneys' fees arising from claims for "breach . . . of any . . . duties and/or obligations hereunder." Since the Term Sheet sets out various duties and obligations that 4Kids undertakes *vis a vis* Upper Deck, and vice versa, the plain language of the Term Sheet contemplates payment of attorneys' fees in actions for breach brought by one party to the contract against the other.

The indemnification clauses in  [*37] the Dinosaur King Production Agreement are worded differently. They provide for fee indemnification in an action arising out of or in connection with "the breach by [Upper Deck] of any of the *foregoing* representations, warranties and obligations." Review of the Agreement reveals that, while breaches of certain of the representations and warranties (as to ownership of rights, for example) could give rise to an action by a third party, the only obligations imposed by the terms of the Dinosaur King Production Agreement (*i.e.*, the "foregoing" obligation) are obligations as between the parties. The contract does not give rise to any "obligations" by either party to any third party. Therefore, the indemnification agreement refers unequivocally to claims for breach of contract to make payments due under the contract, and an award of attorneys' fees is authorized under New York law.

However, the Court will not be awarding any attorneys' fees incurred from and after the date when the invoice was satisfied. No such award would, in my opinion, be reasonable. That precludes any award of attorneys' fees for the time expended on this silly summary judgment motion.

Furthermore, any fee application  [*38] must be only for time that is unequivocally referable to the assertion in this lawsuit of the claim under the Dinosaur King Commercial Production Agreement. If that time cannot be separately accounted for, no fees will be awarded.

Insofar as the Dinosaur King Commercial Production Agreement is concerned, Plaintiffs' duplicative claims for relief on other theories are dismissed for the reasons discussed above.

## CONCLUSION

There remains to be decided (1) damages due to Plaintiffs for Defendants' breach of the Huntik Term Sheet; (2) the amount of interest due to Plaintiffs for Defendants' breach of the Dinosaur King Commercial Production Agreement; (3) attorneys' fees, if any, attributable to the assertion of the Dinosaur King Commercial Production Agreement claim for breach of contract; and (4) attorneys' fees that may (or may not) end up being awarded pursuant to the Huntik Term Sheet. The parties are expected to be ready for trial on these matters on 48 hours notice, unless within thirty days they agree to a procedure for ascertaining damages that can be done on papers or referred to the Magistrate Judge.

The counterclaims are stayed; the motion addressed to the counterclaims is deemed  [*39] withdrawn.

The Clerk is directed to remove the motion at docket entry 16 from the Court's list of pending motions.

This constitutes the decision and order of the Court.

Dated: May 31, 2011

/s/ Colleen McMahon

U.S.D.J.



SONIA WAGNER, Plaintiff, -against- METROPOLITAN LIFE INSURANCE COMPANY, UNITED AIR LINES, INC., and EDWARD WAGNER, Defendants.

08 Civ. 11284 (GBD)(HBP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2011 U.S. Dist. LEXIS 74954*

February 28, 2011, Decided
February 28, 2011, Filed

**SUBSEQUENT HISTORY:** Adopted by, Summary judgment granted by, Summary judgment denied by, Motion to strike denied by, As moot *Wagner v. Metro. Life Ins. Co., 2011 U.S. Dist. LEXIS 71310 (S.D.N.Y., July 1, 2011)*

**COUNSEL:** [*1] For Sonia I. Wagner, Surviving Spouse, herein represented by Corpuz and Associates, P.C., as Attorney-in-Fact, Plaintiff: Benjy Montesa Corpuz, LEAD ATTORNEY, Corpuz and Associates, P.C., New York, NY.

For Metropolitan Life Insurance Company, Defendant: Michael H Bernstein, LEAD ATTORNEY, John T Seybert, Sedgwick LLP, New York, NY.

For United Airlines, Inc., Defendant: Michael H Bernstein, LEAD ATTORNEY, Sedgwick LLP, New York, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge. HONORABLE GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** HENRY PITMAN

**OPINION**

REPORT AND RECOMMENDATION

PITMAN, United States Magistrate Judge:

TO THE HONORABLE GEORGE B. DANIELS, United States District Judge,

I. Introduction

This action arises out of a dispute between plaintiff Sonia Wagner and defendants Metropolitan Life Insurance Company ("MetLife"), United Air Lines, Inc. ("United") and Edward Wagner regarding the disbursement of life insurance benefits from an employee welfare benefits plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), *29 U.S.C. §§ 1001 et seq.* Plaintiff and defendants MetLife and United cross-move for summary judgment on the issues of whether MetLife's determination [*2] to disburse life insurance benefits to Edward Wagner and former defendant Elizabeth Wagner, and not to plaintiff, was arbitrary and capricious and whether MetLife and United breached their fiduciary duties. MetLife and United also move to strike plaintiff's affidavit and the documents annexed thereto in support of her motion for summary judgment, as well as all corresponding statements in her Rule 56.1 statement.

For the reasons set forth below, I respectfully recommend that: (1) MetLife and United's motion for summary judgment (Docket Item 42) be granted; (2) plaintiff's cross-motion for summary judgment (Docket Items 36, 47) be denied, and (3) MetLife and United's motion to strike (Docket Items 52) be denied as moot.

II. Facts

A. Background

This dispute arises from an ERISA Plan sponsored by United that provided life insurance for United's employees. Edward D. Wagner, who is now deceased, is a former United employee who had a life insurance policy

2011 U.S. Dist. LEXIS 74954, *

issued by MetLife pursuant to the plan. Plaintiff claims to be the wife of Edward D. Wagner and, thus, the rightful beneficiary of Edward D. Wagner's Plan. No beneficiary was named in Edward D. Wagner's policy. Defendant Edward Wagner and Elizabeth [*3] Wagner are the son and daughter of Edward D. Wagner. Edward Wagner and Elizabeth Wagner filed claims under the Plan following Edward D. Wagner's death and received a total of $86,094.26 in benefits from MetLife.

1. The ERISA Plan

From December 1969 until his death on December 5, 2005, Edward D. Wagner was employed by United (Defendants' Rule 56.1 Statement of Material Facts ("Defs.' 56.1") ¶¶ 1, 10). By virtue of his employment, Edward D. Wagner was enrolled in the United Airlines Employee Welfare Benefit Plan (Defs.' 56.1 ¶ 2). MetLife issued the life insurance polices and administered claims for benefits under the Plan (Defs.' 56.1 ¶ 3, 9). The Plan is an "employee welfare benefit plan" as defined by *29 U.S.C. § 1002(1)* (Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1") ¶ 7). The Plan is governed by ERISA (Pl.'s 56.1 ¶ 8; Summary Plan Description, annexed as Ex. B to Declaration of Andrea Espinosa, dated July 9, 2010 (Docket Item 45) ("Espinosa Decl."), at WAGNER 000094). [1]

1   "WAGNER 000     " refers to the Bates Stamp number on the lower right hand corner of pertinent documents, many of which are otherwise unnumbered.

The Plan provided that if a participant died while covered for Life Benefits, [*4] a beneficiary would be paid the amount accrued at the time of death (Defs.' 56.1 ¶ 4, quoting "Your Employee Benefit Plan, United Air Lines, Inc.," annexed as Ex. A-1 to Declaration of Andrea Espinosa, dated July 9, 2010 ("Espinosa Decl.") (Docket Item 45), at WAGNER 000027). Edward D. Wagner was covered at the time of his death and had accrued $40,000 in Optional Life Benefits and $46,000 in Basic Life Benefits (Life Insurance Claim Form Employer's Statement, annexed as Ex. C-3 to Espinosa Decl., at WAGNER 000247). The Plan defined "Beneficiary" as "the person or persons you choose to receive any benefit payable because of your death" (Defs.' 56.1 ¶ 5 (citation omitted)). Under the Plan, participants were required to make their beneficiary choice in writing on an approved form, which "must be filed" with the Plan's records (Defs.' 56.1 ¶ 5 (citation omitted)).

If a Plan participant died without naming a beneficiary, the Plan provided that the benefits payable

will be divided and paid in equal shares to each member of the first class in the order listed below in which there is a

person who is related to you and who survives you:

1. your Spouse;
2. your child(ren);

3. your parent(s);

4. your   [*5] sibling(s);

However, we may instead pay all or part of that amount to your estate. Any payment will discharge our liability for the amount so paid.

("Your Employee Benefit Plan, United Air Lines, Inc.," annexed as Ex. A-1 to Espinosa Decl., at WAGNER 000038-39, 000080). [2]

2   The Plan's Summary Plan Description described this procedure in nearly identical terms, with differences not pertinent to these motions (see Summary Plan Description ("SPD"), dated January 2003, annexed as Ex. B to Espinosa Decl., at L-4).

According to the Plan's Summary Plan Description, the Plan Administrator delegated the authority to determine insured benefits to the insurance company (SPD, dated December 2005, annexed as Ex. B to Espinosa Decl., at G-4-G-5). MetLife was given "the sole authority to determine who is eligible for the Plan, what benefits they are entitled to under the terms of the Plan, what the terms of the Plan mean, and any other claims under the plan" (SPD, annexed as Ex. B to Espinosa Decl., at G-4).

2. Instructions for Filing a Claim

According to the Summary Plan Description, "[a] claim for loss of life must be filed by contacting the United Benefit Service Center (UBSC) at 1-888-825-0188. The   [*6] UBSC will provide MetLife with the necessary information to initiate the claim process" (SPD, annexed as Ex. B to Espinosa Decl., at L-7). The Plan provided that claimants for Life Benefits complete a form and submit an original certified death certificate that included the cause of death (Defs.' 56.1 ¶ 8 (citation omitted)). The Plan's claim information further provided that all Optional Life Benefits claim forms could be obtained from MetLife and that all Basic Life Benefits could be obtained from United (Ex. A-2 to Espinosa Decl., at WAGNER 000042, 000085).

MetLife's Life Insurance Claim Form included an Employer's Statement (Ex. C-2 to Espinosa Decl., at WAGNER 000221-222). On an attached instruction form, MetLife directed the employer to detach the instructions,

complete the Employer's Statement and give the claimant the remaining pages to complete the Claimant's Statement (Ex. C-2 to Espinosa Decl., at WAGNER 000220). [3] The employer was to submit the Employer's Statement to MetLife with "all other pertinent claim information (such as enrollment forms and beneficiary designations)" (Ex. C-2 to Espinosa Decl., at WAGNER 000220).

> 3    MetLife and United dispute that the instruction form [*7] was applicable to United Life Benefit claims, noting that plaintiff submitted the form in her correspondence.

### 3. Disbursement of Decedent's Benefits

On December 5, 2005, Edward D. Wagner died in Brazil of natural causes (Report of Death of an American Citizen Abroad, dated Dec. 9, 2005, annexed as Ex. C-4 to Espinosa Decl., at WAGNER 000263). Edward D. Wagner had never submitted a beneficiary designation form to MetLife (Pl.'s Response to Defs.' 56.1 ¶ 11).

On December 12, 2005, Elizabeth Wagner, Edward D. Wagner's daughter, advised United of her father's death by telephone (Non-Retiree Death Notification Form, annexed as Ex. C-4 to Espinosa Decl., at WAGNER 000258). She spoke with Laurie Fahrenkrog, who filled out a Non-Retiree Death Notification Form and sent it to MetLife (Defs.' 56.1 ¶ 14, citing Ex. C-4 to Espinosa Decl., at WAGNER 000258). One of Fahrenkrog's contact numbers on the form was the United Benefit Service Center number listed in the Plan's Summary Plan Description (Ex. C-4 to Espinosa Decl., at WAGNER 000258; SPD, annexed as Ex. B to Espinosa Decl., at L-7). The completed form contained a handwritten statement across the top noting "no bene[ficiary] on file" (Non-Retiree [*8] Death Notification Form, annexed as Ex. C-4 to Espinosa Decl., at WAGNER 000258).

By letter dated December 22, 2005, MetLife Customer Service Representative Donna L. Wheat mailed Edward Wagner, Edward D. Wagner's son, a "beneficiary death packet" containing an Affidavit for Claim Consideration Form, Claimant's Statement/TCA Form and a return envelope (Pl.'s Response to Defs.' 56.1 ¶ 16). [4] This packet was sent to the same address in Orland Park, Illinois, that Elizabeth Wagner had provided United (Letter to Edward Wagner, Ex. C-4 to Espinosa Decl., at WAGNER 000251; Non-Retiree Death Notification Form, annexed as Ex. C-4 to Espinosa Decl., at WAGNER 000258).

> 4    MetLife and United dispute that Wheat is a MetLife Customer Representative and note that the letter in question contained "United Airlines" on the right side of the letterhead.

On December 29, 2005, MetLife received a completed Employer's Statement calculating Edward D. Wagner's Life Benefits (Pl.'s Response to Defs.' 56.1 ¶ 18, citing Ex. C-3 to Espinosa Decl., at WAGNER 000247-248). The form directed the employer to "attach any enrollment forms and beneficiary designations [it] retained" (Ex. C-3 to Espinosa Decl., at WAGNER 000247). [*9] The Employer's Statement did not have an area to identify beneficiaries, and United sent no attachments (Defs.' 56.1 ¶ 20; Pl.'s Response to Defs.' 56.1 ¶ 20). Donna Wheat signed the form where an employer's authorized representative's signature was required (Ex. C-3 to Espinosa Decl., at WAGNER 000247).

On January 9, 2006, MetLife received: (1) Claimant's Statements from both Edward Wagner and Elizabeth Wagner certifying that their father was "divorced" (Ex. C-3 to Espinosa Decl., at WAGNER 000243-246); (2) a Claimant's Affidavit from Edward Wagner indicating that his father was divorced from Susan Wagner on November 27, 2002, and making no mention of plaintiff (Ex. C-4 to Espinosa Decl., at WAGNER 000260-262), and (3) a certified copy of the Report of Death of an American Citizen Abroad listing the cause of death (Defs.' 56.1 ¶ 28). This certificate stated that Edward D. Wagner's body had been shipped to Orland Park, Illinois (Report of Death of an American Citizen Abroad, attached as Ex. C-4 to Espinosa Decl., at WAGNER 000263). On January 13, 2006, MetLife approved the claims of Edward Wagner and Elizabeth Wagner and paid all Plan life benefits to them in equal shares of $43,047.13, [*10] which included interest (Defs.' 56.1 ¶ 34-35; Pl.'s Response to Defs.' 56.1 ¶ 34-35; Ex. C-4 to Espinosa Decl. at WAGNER 000265).

### 4. Plaintiff's Request for Benefits

On April 30, 2007, United received plaintiff's letter inquiring about a death benefit for Edward D. Wagner, whom she called her husband (Defs.' 56.1 ¶ 36). She enclosed a marriage certificate from the Philippines Office of the Registrar General indicating that she and Edward D. Wagner had been married on February 4, 2002 (Defs.' 56.1 ¶ 37, citing Ex. C-4 to Espinosa Decl., at WAGNER 000271). MetLife received the letter and enclosures on May 7, 2007 (Pl.'s Response to Defs.' 56.1 ¶ 38).

On May 18, 2007, MetLife employee Cheri Ciacciarelli-Natale reviewed the letter and the file and recommended that plaintiff be sent a letter explaining that the benefits had already been paid in good faith to Edward D. Wagner's children (Defs.' 56.1 ¶ 39, citing Activity to Client Contact File, Ex. C-1, annexed to Espinosa Decl., at WAGNER 000157; and Referral, Ex. C-4, annexed to Espinosa Decl., at WAGNER 000268). [5] MetLife super-

visor Tim Copperwheat approved this recommendation (Pl.'s Response to Defs.' 56.1 ¶ 40). By letter dated June 6, [*11] 2007, MetLife explained that there was no beneficiary on file and it had paid the claim pursuant to the Claimant's Affidavit, which made no mention that Edward D. Wagner was married at his death. "Therefore . . . our liability on this claim has been satisfied" (Ex. C-4 to Espinosa Decl., at WAGNER 000266-267).

    5    Plaintiff disputes these facts.

    On July 31, 2007, MetLife received another letter from plaintiff disputing the claim and contending that Elizabeth Wagner knew of, and attended, the marriage of Edward D. Wagner and plaintiff (Ex. C-4 to Espinosa Decl., at WAGNER 000276). Plaintiff enclosed an affidavit signed by Edward D. Wagner and dated January 31, 2002, declaring that there was "no legal impediment to [his] marriage" to plaintiff (Defs.' 56.1 ¶ 45; Ex. C-4 to Espinosa Decl., at WAGNER 000278). MetLife supervisor Copperwheat noticed that plaintiff's purported date of marriage to plaintiff preceded the date given by Edward Wagner for decedent's divorce from his first wife, and Copperwheat advised that another "paid in good faith" letter be drafted including this fact (Defs.' 56.1 ¶ 47, citing Activity to Client Contact File, Ex. C-1, annexed to Espinosa Decl., at WAGNER 000154; [*12] and Referral, Ex. C-4, annexed to Espinosa Decl., at WAGNER 000275). [6] MetLife sent out the second "paid in good faith" letter to plaintiff, dated September 20, 2007, but it made no mention of the conflicting dates (Ex. C-4 to Espinosa Decl., at WAGNER 000273-274).

    6    Plaintiff disputes these facts.

    On March 3, 2008, plaintiff requested a claim form from MetLife, but MetLife refused to provide one because the claim had been paid and the file was closed (Defs.' 56.1 ¶ 53). By letter dated June 4, 2008, plaintiff enclosed several documents supporting her benefits demand (Defs.' 56.1 ¶ 54). A 2002 Benefit Confirmation Form in Edward D. Wagner's name was enclosed, describing "Medical and Dental Elections" and naming Elizabeth Wagner and plaintiff as eligible dependents (Defs.' 56.1 ¶ 54, citing Ex. C-2 to Espinosa Decl., at WAGNER 000201). The dental plan election was entitled "Traditional Dental (MetLife)" (Ex. C-2 to Espinosa Decl., at WAGNER 000201). Plaintiff also enclosed a completed Claimant's Statement (Ex. C-2, annexed to Espinosa Decl., at WAGNER 000205-206).

    MetLife employee Linda Desmarais reviewed plaintiff's submission, questioned whether plaintiff's marriage to decedent was legal [*13] and recommended sending a third "paid in good faith" letter (Defs.' 56.1 ¶ 54, citing Referral, attached as Ex. C-2, annexed to Espinosa Decl., at WAGNER 000215-216). [7] By letter dated August 4,

2008, MetLife advised plaintiff that the Plan was governed by ERISA and that MetLife was adhering to its denial of plaintiff's claim because it had "re-examined the entire claim file, including examination of any additional material and information provided with your request for appeal," had found no designated beneficiary and had paid the benefits to Edward D. Wagner's children under the Plan's facility of payment provisions (Ex. C-2 to Espinosa Decl., at WAGNER 000213).

    7    Plaintiff disputes these facts.

    By letter dated September 29, 2008, plaintiff made a formal and final demand for payment (Ex. C-2 to Espinosa Decl., at WAGNER 000217-218). She claimed that an examination of records would have shown that she had been designated as Edward D. Wagner's beneficiary in medical and dental plans administered by MetLife from 2002 and that MetLife had failed to follow its claim procedures (Ex. C-2 to Espinosa Decl., at WAGNER 000217). On October 28, 2008, MetLife reviewed plaintiff's letter and decided [*14] to "reach out to the children to verify the date of divorce from Susan Wagner" (Referral, attached as Ex. C-2, annexed to Espinosa Decl., at WAGNER 000224-225). MetLife wrote to Edward Wagner on November 14, 2008, stating that its records showed the date of divorce between Edward D. Wagner and Susan Wagner to be November 27, 2002, and requesting a "divorce decree or other legal document[] that would support that this was the date of their divorce" (Ex. C-3 to Espinosa Decl., at WAGNER 000226). The letter was returned by the United States Postal Service, and MetLife never received a response (Defs.' 56.1 ¶ 63, citing Ex. C-3, annexed to Espinosa Decl., at WAGNER 000227-229).

B. Procedural History

    On October 31, 2008, plaintiff commenced this action in New York State Supreme Court against MetLife (see Declaration of Michael H. Bernstein, Esq., dated July 9, 2010 (Docket Item 46), at ¶ 3); Ex. C-3 to Espinosa Decl., at WAGNER 000230-238). MetLife removed the action to this Court on December 29, 2008, based on federal question jurisdiction because all of plaintiff's claims were preempted by ERISA (Notice of Removal, Docket Item 1). On February 6, 2009, MetLife answered the Complaint (Docket [*15] Item 6). On April 28, 2008, plaintiff filed an Amended Complaint, adding United, Edward Wagner and Elizabeth Wagner as defendants (Docket Item 11). The Amended Complaint asserted claims against MetLife and United under ERISA for failure to provide promised benefits to a rightful beneficiary and for breach of fiduciary duties, as well as claims against Edward Wagner and Elizabeth Wagner for fraud. Plaintiff sought the full face value of the life in-

surance policy plus interest, punitive damages and attorney's fees. On July 20, 2009, MetLife and United answered the Amended Complaint and filed cross-claims for indemnification against Edward Wagner and Elizabeth Wagner (Docket Item 21).

On July 2, 2009, Elizabeth Wagner, proceeding pro se, moved to dismiss for lack of personal jurisdiction. By Order dated January 25, 2010, your Honor granted the motion and dismissed Elizabeth Wagner from the action. On February 8, 2010, MetLife and United filed a motion for reconsideration of the January 25, 2010, Order, which your Honor denied on February 25, 2010.

On July 9, 2010, plaintiff and MetLife and United moved for summary judgment. On July 16, 2010, plaintiff filed an affidavit with attachments   [*16] in support of her motion (Docket Item 51), as well as a Rule 56.1 statement (Docket Item 49). On July 30, 2010, MetLife and United moved to strike plaintiff's affidavit, attachments and any corresponding statements in her Rule 56.1 statement (Docket Item 52) on the ground that plaintiff was introducing "evidence that was not before MetLife at the time it made its benefit determination" (Memorandum of Law In Support of Motion to Strike, dated July 30, 2010 (Docket Item 54), at 1). Plaintiff argued that the disputed documents could be considered under a de novo standard of review (Memo in Opposition to Motion to Strike (Docket Item 64) at 1-2.

III. Analysis

A. Summary Judgment Standard

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*. This form of relief is appropriate when, after discovery, the party . . . against whom summary judgment is sought has not shown that evidence of an essential element of her case -- one on which she has the burden of proof -- exists. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*.   [*17] This form of remedy is inappropriate when the issue to be resolved is both genuine and related to a disputed material fact. An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment. See *Howard v.*

*Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990)*. Moreover, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*.

If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with "specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)*. If the non-movant fails to meet this burden, summary judgment will be granted against it.

*Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004)*; accord *Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007)*;   [*18] *Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005)*; *Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223-24 (2d Cir. 1994)*; see also *McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 n.4 (2d Cir. 2006)* ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

"In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Stated more succinctly, '[t]he evidence of the non-mov-ant is to be believed.'" *Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253-54 (2d Cir. 2002)*, quoting *Anderson v. Liberty Lobby, Inc., supra, 477 U.S. at 255*; accord *Jeffreys v. City of New York, supra, 426 F.3d at 553* ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (citation and internal quotations omitted); see also *Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004)*; *Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)*. These same standards apply where, as here, there are cross-motions   [*19] for summary judgment. *Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc., 88 F. Supp. 2d 188, 193 (S.D.N.Y. 2000)* (Hellerstein, D.J.). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the *Rule 56* standard." 10A

Charles A. Wright, Arthur A. Miller, Mary K. Kane, Federal Practice & Procedure § 2720 at 335-36 (3d ed. 1998).

"Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007)*, quoting *Anderson v. Liberty Lobby, Inc., supra, 477 U.S. at 248*; accord *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007)*. "'[I]n ruling on a motion for summary judgment, a judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented[.]'" *Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 788 (2d Cir. 2007)*, quoting *Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 298 (2d Cir. 1996)*.

B.   [*20] Laches

MetLife and United move for summary judgment on the basis that plaintiff's claims under *ERISA Sections 502(a)(1)(B)* and *502(a)(3)* are barred by laches. Laches is an equitable defense frequently summarized by the maxim that "equity aids the vigilant, not those who sleep on their rights." *Stone v. Williams, 873 F.2d 620, 623-24 (2d Cir. 1989)* (citations omitted), opinion vacated on reh'g on other grounds, *891 F.2d 401, 404-05 (2d Cir. 1989)*. Its applicability is based upon the circumstances specific to each case. See *Stone v. Williams, supra, 873 F.2d at 624*.

Plaintiff seeks plan benefits under *ERISA Section 502(a)(1)(B)*, which states that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." *29 U.S.C. § 1132*. The Second Circuit has held that such claims "are inherently equitable in nature, not contractual." *DeFelice v. Am. Intern. Life Assur. Co. of N.Y., 112 F.3d 61, 64 (2d Cir. 1997)*, citing *Sullivan v. LTV Aerospace & Def. Co., 82 F.3d 1251, 1257-59 (2d Cir. 1996)*.   [*21] But see *Yoon v. Fordham Univ. Faculty & Admin. Ret.Plan, 99 Civ. 11042 (RCC), 2004 U.S. Dist. LEXIS 26070, 2004 WL 3019500 at *14 (S.D.N.Y. Dec. 29, 2004)* (Casey, D.J.), aff'd, *173 F. App'x 936 (2d Cir. 2006)* (holding that doctrine of laches did not apply because "[p]laintiff's claims for pension contributions are at law, not at equity.").

Plaintiff also seeks relief under *ERISA Section 502(a)(3)(B)*, which states that a plan participant, beneficiary or fiduciary may bring a civil action "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan" (emphasis added). The Second Circuit has held that if "an ERISA fiduciary deals unfairly with a plan's beneficiaries, a claim for breach of fiduciary duty may lie under *ERISA § 502(a)(3)*." *Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 630 (2d Cir. 2008)*, citing *Frommert v. Conkright, 433 F.3d 254, 269-72 (2d Cir. 2006)*; and *Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 88-89 (2d Cir. 2001)*.

The elements of the defense of laches are (1) plaintiff's knowledge of defendant's conduct; (2) plaintiff's unreasonable delay in filing suit, and (3) prejudice to defendant.   [*22] See *Eppendorf-Neteler-Hinz GmbH v. Enteron Co., 89 F. Supp. 2d 483, 485 (S.D.N.Y. 2000)* (Motley, D.J.). The burden of establishing a defense of laches generally falls on the defendant. See *Eppendorf-Neteler-Hinz GmbH v. Enteron Co., supra, 89 F. Supp. 2d at 485*. However, the Second Circuit has held that "[l]aches is not a defense to an action filed within the applicable statute of limitations." *United States v. RePass, 688 F.2d 154, 158 (2d Cir. 1982)*, citing *United States v. Mack, 295 U.S. 480, 489, 55 S. Ct. 813, 79 L. Ed. 1559 (1935)*; see also *United States v. Milstein, 401 F.3d 53, 63 (2d Cir. 2005)* (the "well established . . . general rule" is that laches is no defense within limitations period); *Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 260 (2d Cir. 1997)* ("The prevailing rule, then, is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely."); *ILGWU Nat'l Ret. Fund v. Smart Modes of Cal., Inc., 735 F. Supp. 103, 106 (S.D.N.Y. 1990)* (Patterson, D.J.) ("[I]t is well-established that, where the applicable statute of limitations has not yet   [*23] expired, the defense of laches is inapplicable.") (citations omitted)). But see *Ikelionwu v. United States, 150 F.3d 233, 238 (2d Cir. 1998)* ("[I]f the applicable legal statute of limitations has not expired, there is rarely an occasion to invoke the doctrine of laches . . . ."); *Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996)* ("When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show . . circumstances exist which require the application of the doctrine of laches." (citation omitted)). In *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 83 Civ. 5401 (DC), 1997 U.S. Dist. LEXIS 7234, 1997 WL 278116 at *2 (S.D.N.Y. May 22, 1997)*, the Honorable Denny Chin, then a United States District Judge, stated that it was "the law of this Circuit that laches may not be asserted as a defense if the applicable statute of limitations has not run" and added that "I can see no reason not to apply this rule to claims under ERISA." (citations omitted).

Under *ERISA Section 413,*

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation   [*24] of this part, after the earlier of -
>
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

*29 U.S.C. § 1113.*

The Second Circuit has held that "*ERISA § 413* applies only to breach of fiduciary duty claims." *Campanella v. Mason Tenders' Dist. Council Pension Plan, 132 F. Appx. 855, 856 (2d Cir. 2005)*; see also *Carollo v. Cement & Concrete Workers Dist. Council Pension Plan, 964 F. Supp. 677, 687 (E.D.N.Y. 1997)*. The Second Circuit has also held that the six-year statute of limitations period under New York Civil Practice Law and Rules ("C.P.L.R.") *Section 213* applies to other claims brought under *ERISA Section 502, 29 U.S.C. § 1132. Campanella v. Mason Tenders' Dist. Council Pension Plan, 299 F. Supp. 2d 274, 280 (S.D.N.Y. 2004)* (Marrero, D.J.), citing *Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Emp. Pension Ben. Plan, 698 F.2d 593, 598 (2d Cir. 1983).*   [*25] Under *N.Y.C.P.L.R. Section 213*, the Second Circuit has held that a claim "under ERISA accrues upon a clear repudiation by the plan that is known, or should be known, to the plaintiff -- regardless of whether the plaintiff has filed a formal application for benefits." *Carey v. Int'l Broth. of Elec. Workers Local 363 Pension Plan, 201 F.3d 44, 49 (2d Cir. 1999).*

Because plaintiff's claims under *ERISA Section 502(a)(3)* are breach of fiduciary duty claims, these are subject to the *ERISA Section 413* limitations period. Her claims under *Section 502(a)(1)(B)* are subject to the N.Y.C.P.L.R. six-year period. Plaintiff's claims are within these periods. Under these facts, plaintiff's breach

of fiduciary duty claims would be subject to the shorter limitations period of three years after the earliest date on which she had actual knowledge of a breach or violation. MetLife notified plaintiff by letter dated June 6, 2007 that MetLife had already paid out benefits "to the 1st class of lineal heirs listed on the Claimants Affidavit per the plan[']s facility of payment provision" (Ex. C-4, annexed to Espinosa Decl., at WAGNER 000266). This was the initial means by which plaintiff received actual knowledge   [*26] that MetLife and United had already processed a claim and paid benefits to someone else. Plaintiff's action against MetLife, filed in state court on October 31, 2008, was removed to this Court on December 29, 2008. [8] Therefore, these claims are within the three-year period.

> [8]   At least one court within this Circuit has held that filing an action in state court does not equitably toll ERISA's statute of limitations. *Manginaro v. Welfare Fund of Local 771, I.A.T.S.E., 21 F. Supp. 2d 284, 298-99 (S.D.N.Y. 1998)* (Mukasey, D.J.), citing *Shofer v. Hack Co., 970 F.2d 1316, 1318-19 (4th Cir. 1992)).*

Plaintiff's *502(a)(1)(B)* claims fall within the longer six-year period. MetLife's letter dated June 6, 2007, was "a clear repudiation by the plan" that was known, or should have been known, to the plaintiff, even though the plaintiff had not made a formal application for benefits. *Carey v. Int'l Broth. of Elec. Workers Local 363 Pension Plan, supra, 201 F.3d at 49.* Thus, plaintiff's *502(a)(1)(B)* claims are also timely.

Although I find Judge Chin's holding in *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., supra, 1997 U.S. Dist. LEXIS 7234, 1997 WL 278116 at *2*, to be controlling here, I shall, nevertheless, briefly   [*27] address the merits of MetLife and United's laches defense.

Plaintiff's delay in filing suit was not unreasonable. MetLife received a letter from plaintiff on May 7, 2007 -- almost 16 months after MetLife paid benefits to Edward D. Wagner's children -- when it was forwarded from United (see Defs.' 56.1 ¶ 36-38). MetLife and plaintiff began corresponding by letter for the next 17 months before the suit was filed. Plaintiff was living in the Philippines and stated in a subsequent letter that her "English is very poor" (Letter of July 8, 2007, annexed as Ex. C-4 to Espinosa Decl., at WAGNER 000276). As she received correspondence, she responded with more information and documentation, and MetLife did not expressly "uphold the denial of this claim" until a letter was sent dated August 4, 2008 (Ex. C-4, annexed to Espinosa Decl., at WAGNER 000213). Less than three months later, plaintiff filed suit. Given the geographic distance between the parties, the language barrier and plaintiff's

initial confusion regarding who to contact and how to file a claim -- which is clear from the administrative record --I conclude that this delay was not unreasonable. Thus, I need not reach the issue as to whether   [*28] MetLife and United were prejudiced.

Therefore, I conclude that plaintiff's claims are not barred by laches, and I respectfully recommend that MetLife and United's motion for summary judgment on this basis be denied.

## C.  Review of Plan Disbursement Determination under ERISA

### 1.  Arbitrary and Capricious Standard

In *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)*, the United States Supreme Court held that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When a claim administrator or fiduciary possesses such discretionary authority, "[t]rust principles make a deferential standard of review appropriate." *Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)*, quoting *Firestone Tire & Rubber Co. v. Bruch, supra, 489 U.S. at 111* (citation and internal quotation marks omitted) (emphasis added by Glenn).

Furthermore, the Second Circuit has held that in these cases, "we will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009)*,   [*29] quoting *Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995)*; *Richard v. Fleet Fin. Grp. Inc. Ltd. Emp. Benefits Plan, 367 F. Appx. 230, 232 (2d Cir. 2010)*; *Tortora v. SBC Commc'ns, Inc., 739 F. Supp. 2d 427, 2010 WL 3154566 at *5 (S.D.N.Y. 2010)* (Scheindlin, D.J.). Under the "arbitrary and capricious" standard, a court cannot "overturn a decision to deny or terminate benefits unless 'it was without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Fuller v. J.P. Morgan Chase & Co., 423 F.3d 104, 107 (2d Cir. 2005)*, quoting *Pagan v. NYNEX Pension Plan, supra, 52 F.3d at 442* (citation and internal quotation marks omitted). "Substantial evidence" is defined as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached . . . . [It] requires more than a scintilla but less than a preponderance." *Wiener v. Health Net of Conn., Inc., 311 F. App'x 438, 440 (2d Cir. 2009)*, quoting *Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995)* (internal quotation marks omitted); see also *Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 141 (2010)*;

*Giraldo v. Bldg. Serv. 32B-J Pension Fund, 04 Civ. 3595 (GBD), 2009 WL 812044 at *4 (S.D.N.Y. Mar. 25, 2009)*   [*30]   (Daniels, D.J.).

Where a plan administrator "is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co. v. Bruch, supra, 489 U.S. at 115* (citation and internal quotation marks omitted). A conflict of interest exists where the administrator of an ERISA plan "both evaluates claims for benefits and pays benefits." *Metro. Life Ins. Co. v. Glenn, supra, 554 U.S. at 112*. The United States Supreme Court has declined to require a de novo review even where a conflict exists, recently holding that "[w]e do not believe that Firestone's statement implies a change in the standard of review, say, from deferential to de novo review." *Metro. Life Ins. Co. v. Glenn, supra, 554 U.S. at 115* (emphasis in original); see also *Conkright v. Frommert, U.S.    , 130 S. Ct. 1640, 1647, 176 L. Ed. 2d 469 (2010)* ("a systemic conflict of interest does not strip a plan administrator of deference" (citation omitted)); *Kelly v. Handy & Harman, 406 Fed. Appx. 538, 2011 WL 159601 at *1 (2d Cir. 2011)*; *Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82-83 (2d Cir. 2009)*   [*31]   ("plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of 'several different considerations' that judges must take into account when 'review[ing] the lawfulness of benefit denials.'" (quoting *McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir. 2008)*); *Tortora v. SBC Commc'ns, Inc., supra, 739 F. Supp. 2d 427, 2010 WL 3154566 at *6 n.90*.

MetLife was given full discretionary authority to administer the plan (Pl.'s Response to Defs.' 56.1 ¶ 9), so the arbitrary and capricious standard of review is appropriate. MetLife also concedes it operated under a structural conflict of interest (Defendants' Reply Memorandum of Law "Defs.' Reply"), dated August 13, 2010 (Docket Item 61), at 7). I must, therefore, consider this factor in determining whether MetLife's denial of benefits to plaintiff was arbitrary and capricious.

### 2.  MetLife's Decision Was Not Arbitrary and Capricious

My analysis necessarily includes MetLife's initial decision to disburse Life Benefits to Edward D. Wagner's children as well as its denial of plaintiff's claim after they came forward. I conclude that MetLife was not arbitrary and capricious, and I respectfully   [*32]   recommend that the court grant summary judgment for MetLife and United on this issue.

#### a. Initial Decision

"Judicial review of defendant's denial of ERISA plan benefits to plaintiff . . . is concededly limited to a review of the administrative record." *Maskara v. First Unum Life Ins. Co., 03 Civ. 498 (MHD), 2004 WL 1562722 at *1 (S.D.N.Y. July 13, 2004)* (Dolinger, M.J.), citing *Miller v. United Welfare Fund, supra, 72 F.3d at 1071*; see also *Cirincione v. Plumbers Local Union No. 200 Pension Fund, 404 Fed. Appx. 524, 2010 WL 5150169 at *2 (2d Cir. Dec. 15, 2010)*; *Richard v. Fleet Fin. Grp. Inc. Ltd. Emp. Benefits Plan, supra, 367 F. Appx. at 233*. Therefore, I evaluate MetLife's initial decision based solely on information before it on January 13, 2006, when it disbursed benefits to Edward Wagner and Elizabeth Wagner.

Because Edward D. Wagner died without naming a Life Benefits beneficiary, MetLife could disburse benefits to surviving children provided that there was no surviving spouse. At the time of disbursement, MetLife possessed: (1) a Non-Retiree Death Notification Form completed by United following Elizabeth Wagner's telephone call, noting "no bene[ficiary] on file"; (2) a completed Employer's Statement [*33] calculating Life Benefits; (3) a certified copy of the Report of Death of an American Citizen Abroad listing the cause of death and noting that decedent's remains were shipped to the same town in which Edward D. Wagner's children resided; (4) a Claimant's Affidavit from Edward Wagner indicating that decedent was divorced from Susan Wagner on November 27, 2002, with no mention of plaintiff; and (5) Claimant's Statements from Edward Wagner and Elizabeth Wagner certifying that decedent was divorced.

MetLife had no notice of a competing claim at the time. [9] Thus, the administrative record pointed to the definitive conclusion that Edward D. Wagner had no spouse at the time of his death, and that there was, therefore, no one with a claim superior to his children's claim. These documents clearly meet the substantial evidence standard.

> 9    Plaintiff claims she attempted to reach United before the disbursement and claims she called the UBSC number listed in the Summary Plan Description and left a message with an "urgent request for a return call" which she never received (Plaintiff's Memorandum of Law, dated July 16, 2010 (Docket Item 48), at 3).

Plaintiff argues that MetLife did not follow its procedures [*34] when it made to Edward D. Wagner's children. First, she points out that Plan instructions directed that Life Benefits forms should be obtained from the employer. She also argues that a MetLife claim instruction form required employers to fill out the Employer's Statement and distribute the remaining forms to claimants. Finally, she argues that Donna Wheat was a

MetLife employee, not a United employee, and that Wheat filled out the Employer's Statement. [10] These arguments are not persuasive.

> 10    MetLife and United maintain the form "manifestly was not completed by MetLife" (MetLife and United's Memorandum in Opposition ("Defs.' Opp.") at 10).

The Plan's Summary Plan Description required that any "claim for loss of life must be filed by contacting the United Benefit Service Center (UBSC) at 1-888-825-0188. The UBSC will provide MetLife with the necessary information to initiate the claim process." Plaintiff concedes that this instruction conflicts with the Plan's instructions that claimants obtain forms from the employer (Pl.'s 56.1 ¶¶ 22-23). The Second Circuit has repeatedly held that "[w]here the terms of a plan and the SPD conflict, the SPD controls." *Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 110, (2d Cir. 2003)*, [*35] citing *Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990)*; *Frommert v. Conkright, supra, 433 F.3d at 265*; *Weinreb v. Hosp. For Joint Diseases Orthopaedic Inst., 404 F.3d 167, 170 (2d Cir. 2005)*. Thus, the analysis must center on whether the claim was initiated by calling the UBSC number and whether United provided sufficient information to initiate the claim process.

While the parties dispute who filled out the Employer's Statement, there is no dispute that Elizabeth Wagner informed United of Edward D. Wagner's death and that United sent a completed Non-Retiree Death Notification Form to MetLife (Pl.'s Response to Defs.' 56.1 ¶¶ 13-14). Notably, one of the United representative's contact numbers on this form is the UBSC telephone number (Ex. C-4 to Espinosa Decl., at WAGNER 000258). Therefore, it is immaterial who completed the Employer's Statement or whether Wheat is a MetLife employee, because in any event, United transmitted sufficient information to MetLife to proceed, namely: (1) claimant contact information; (2) the Life Benefits amount; and (3) confirmation that there was no beneficiary was on file. Therefore, I find that MetLife's decision to disburse benefits to Edward [*36] and Elizabeth Wagner was not arbitrary and capricious, because United and Wagner followed the Summary Plan Description protocol, MetLife had the numerous aforementioned documents before it and MetLife was not aware of any conflicting claim.

### b. Denial of Claim

On May 7, 2007, nearly 16 months after paying benefits to decedent's children, MetLife received a letter from plaintiff requesting benefits. Plaintiff then corresponded with MetLife for over a year before filing suit. During this period, plaintiff added to the administrative

record. MetLife was under a conflict of interest during this period, because its determination of whether plaintiff was a beneficiary was at odds with its policy against paying claims twice. Nevertheless, I conclude that Met-Life's decision to deny plaintiff's claim was not arbitrary and capricious.

MetLife paid the claim to Edward D. Wagner's children and believed the matter was closed pursuant to a Plan provision that "[a]ny payment will discharge the insurance company's liability for the amount so paid" (Summary Plan Description, January 2003, annexed as Ex. B to Espinosa Decl., at L-5). MetLife obviously and appropriately believed that this term of an ER-ISA-governed [*37] plan was controlling. In *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan, 555 U.S. 285, 129 S. Ct. 865, 875, 172 L. Ed. 2d 662 (2009)*, the United States Supreme Court instructed that an ERISA claim "stands or falls by 'the terms of the plan.'" (quoting *29 U.S.C. § 1132(a)(1)(B)*).

>   The point is that by giving a plan partici-
> pant a clear set of instructions for
> making his own instructions clear, ERISA
> forecloses any justification for enquiries
> into nice expressions of intent, in favor of
> the virtues of adhering to an uncompli-
> cated rule: 'simple administration,
> avoid[ing] double liability, and ensur[ing]
> that beneficiaries get what's coming
> quickly, without the folderol essential
> under less-certain rules.'

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan, supra, 555 U.S. 285, 129 S. Ct. at 875-76, 172 L. Ed. 2d 662*, quoting *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275, 283 (7th Cir. 1990)* (Easterbrook, J., dissenting).

In addition, the Summary Plan Description's provi-sion that payment discharges MetLife to the extent of the payment is entirely consistent with common law and is not the product of any conflict of interest. MetLife sent plaintiff numerous letters stating it paid the claim to Ed-ward [*38] Wagner and Elizabeth Wagner "in good faith" (Letter dated June 6, 2007, annexed as Ex. C-4 to Espinosa Decl., at WAGNER 000266-267; Letter dated September 20, 2007, annexed as Ex. C-4 to Espinosa Decl., at WAGNER 000273-274); Letter dated August 4, 2008, annexed as Ex. C-2 to Espinosa Decl., at WAG-NER 000213), and there is no evidence in the record suggesting the contrary. There is a "widespread" com-mon-law principle that "an insurer is discharged from all subsequent liability when it makes good faith payments to a purported beneficiary without notice of any compet-ing claims." *Crosby v. Crosby, 986 F.2d 79, 83 (4th Cir. 1993)* (citations omitted); *Weed v. Equitable Life Assur-ance Soc'y of U.S., 288 F.2d 463, 464 (5th Cir. 1961)*; *Pabon Lugo v. MONY Life Ins. Co. of Am., 465 F. Supp. 2d 123, 130 (D.P.R 2006)*; *Coots v. Allstate Life Ins. Co., 313 F. Supp. 2d 539, 544 (D. Md. 2004)*; *Phoenix Mut. Life Ins. Co. v. Adams, 828 F. Supp. 379, 386 (D.S.C. 1993)*.

In *Crosby v. Crosby, supra, 986 F.2d at 81-83*, the Fourth Circuit upheld benefit payments made by MetLife to a plan participant's second wife because of the docu-mentation supporting her claim and lack of notice of a competing claim. The [*39] first wife -- who was the legal widow because she had never divorced the partici-pant -- sought to recover the payments. *Crosby v. Crosby, supra, 986 F.2d at 81*. Reviewing for abuse of discretion, the Fourth Circuit held that the administrator's "determi-nation was reasonable in light of the documentation re-lied upon" at the time of disbursement because the plan participant had designated the second wife his benefici-ary and the second wife produced a marriage certificate. *Crosby v. Crosby, supra, 986 F.2d at 83*.

Plaintiff argues that Crosby v. Crosby is distin-guishable on its facts because of the presence of the mar-riage certificate in that case. She argues that in Crosby, MetLife "reasonably" relied on the decedent's designa-tion of his second wife as his beneficiary -- and the sec-ond wife's marriage certificate -- as evidence that she was his legal widow (Plaintiff's Memorandum of Law ("Pl.'s Mem."), dated July 16, 2010 (Docket Item 48) at 8. She further argues that Crosby is not controlling because Edward D. Wagner, unlike the decedent in Crosby, did not name a beneficiary.

I do not find plaintiff's argument to be persuasive. In both cases, MetLife followed an established protocol for paying [*40] benefits. In both cases, MetLife also re-lied on both internal documents and documents supplied by claimants. I also note that perhaps the most instructive lesson of Crosby -- as MetLife and United correctly point out -- is that a marriage certificate is not irrefutable proof of a legal marriage.

Here, substantial evidence justified disbursement to Edward D. Wagner's children. Under the Fourth Circuit's holding, this would appear to end the analysis, because review of the determination centers on "the documenta-tion relied upon in making this determination." *Crosby v. Crosby, supra, 986 F.2d at 83*. Plaintiff subsequently submitted documentation to MetLife, including a mar-riage certificate, a document signed by decedent on January 31, 2002, stating that there was no legal im-pediment to his marriage to plaintiff and a 2002 Benefit Confirmation Form listing plaintiff as decedent's medical and dental beneficiary. Nothing submitted by plaintiff

during this period disturbs my conclusion that MetLife properly disbursed the benefits on the record it had at the time.

Plaintiff argues that MetLife and United should have known of plaintiff's status as Edward D. Wagner's wife through the 2002 Benefit [*41] Confirmation Form which identified plaintiff as Edward D. Wagner's wife, particularly because MetLife administered the dental plan benefits (see Defs.' 56.1 ¶ 54, citing Ex. C-2 to Espinosa Decl., at WAGNER 000201). She contends that this information was in the companies' records and should have been considered before MetLife paid decedent's children. Plaintiff cites no authority for her argument that a plan administrator, in paying life insurance benefits, has to search all of its corporate records for the existence of potentially conflicting claims. MetLife and United respond by arguing that privacy regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") prohibited the employees administering life insurance benefits from accessing information maintained by those employees of MetLife that administered health and dental insurance benefits. In support of their argument, United and MetLife cite *45 C.F.R. §§ 164.105(a), 164.501* and *164.502.*

Both parties' arguments on this issue are unconvincing. None of the regulations cited by United and MetLife clearly lead to the conclusion United and MetLife ask me to make. More significantly, MetLife [*42] offers no internal policy manuals or similar documents instructing its employees that documents generated by MetLife's health insurance business are "off limits" to employees involved in its life insurance business. If one class of MetLife employees were legally prohibited from having access to information in the possession of other MetLife employees, one would think that MetLife would formally advise its employees of this limitation. Finally, the notion that the life insurance business does not involve protected health information, as that term is defined in *45 C.F.R. § 160.103*, appears to be fundamentally flawed. I take judicial notice of the fact that many life insurance companies require applicants to submit medical records or to submit to a physical examination before issuing a policy. Thus, the proposition that the life insurance business does not involve protected health information appears to be inconsistent with common business practice.

Nevertheless, plaintiff's argument also fails. In reviewing MetLife's decision to pay the life insurance proceeds to Edward Wagner and Elizabeth Wagner, I may consider "only [*43] the evidence that was before the administrator when it made its decision." *Hess v. Hartford Life & Accident Ins. Co., 274 F.3d 456, 462 (2d Cir. 2001);* accord *Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995)* ("Most circuits have declared that, in reviewing decisions of plan fiduciaries under the

arbitrary and capricious standard, district courts may consider only the evidence that the fiduciaries themselves considered. . . . We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record."). There is no evidence that the 2002 Benefit Confirmation Form which identified plaintiff as Edward D. Wagner's wife was actually considered by MetLife or before MetLife when made its decision to pay benefits to Edward and Elizabeth Wagner. Accordingly, the foregoing authorities teach that it cannot be considered here.

Finally, while MetLife's repeated denials of plaintiff's claim were undoubtedly due, in part, to their conflict of interest, the record reflects that they were not arbitrary and capricious. Their decision was not only based on the terms of the plan but also [*44] supported by common law. Additionally, MetLife reviewed the file each time plaintiff supplemented the record and even reached out, unsuccessfully, to Edward Wagner to produce a divorce decree or similar document. Overturning a benefit denial requires finding that a decision was erroneous as a matter of law, without reason or lacking substantial evidence; given this standard, I cannot find MetLife's actions to be so deficient as to justify such a reversal. For these reasons, I recommend that MetLife and United's motion for summary judgment be granted with respect to this claim, and that plaintiff's motion be denied.

**D. Breach of Fiduciary Duties**

*ERISA Section 404* provides in relevant part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." A fiduciary must discharge his duties exclusively to provide "benefits to participants and their beneficiaries" with the care, skill and diligence of a prudent man under similar circumstances and according to "the documents and instruments governing the plan." *29 U.S.C. § 1104.*

Plaintiff claims that MetLife and United breached their fiduciary duties by failing "to provide [*45] promised benefits to the rightful beneficiary of the plan," failing to exercise prudence or loyalty and failing to conduct a full and fair review (Amend. Compl. ¶¶ 19, 33-34, 36-41). In addition to the arguments rejected above, plaintiff contends that MetLife: (1) failed to provide documents and claim forms to plaintiff; (2) failed to describe the Plan's appeal procedure, including the right to sue; (3) failed to scrutinize representations made by Edward D. Wagner's children, and (4) gave conflicting reasons for the denial (Amend. Compl. ¶¶ 26-28, 37-38). Plaintiff argues that United: (1) provided incomplete information to MetLife; (2) failed to attach "any enrollment forms and beneficiary designations" it retained,

including records in Edward D. Wagner's medical plan, dental plan and travel plan; (3) never responded to letters, emails or phone calls both before and after benefits were paid; (4) failed to monitor the "imprudent actions and decisions" MetLife made in processing the claim, and (5) failed to exercise reasonable efforts to remedy MetLife's breach (Pl.'s Mem. at 27-28; see also Amend. Compl. ¶¶ 45-49). Plaintiff seeks the full face value of Plan benefits plus interest, [*46] damages, de novo review and a presumption of exhaustion of remedies (Am. Compl. at ¶¶ 20, 35, 41, 50).

MetLife and United oppose these claims on the grounds that: (1) plaintiff fails to seek cognizable equitable relief; (2) United is not a fiduciary under ERISA; (3) MetLife owed no continuing fiduciary duties to plaintiff once benefits were paid; and (4) MetLife did not breach its fiduciary duties (Defs.' Opp. at 14-20). I need only address their first argument.

Plaintiff asserts her claim for breach of fiduciary duty under *Section 502(a)(3)*, which permits a court to grant only equitable relief.

> *Section 502(a)(3)* has been character- ized as a "catch-all" provision which normally is invoked only when relief is not available under *§ 502(a)(1)(B)*. *Varity Corp. v. Howe, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996);* see also id. (stating that *§ 502(a)(3)* "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that *§ 502* does not elsewhere adequately remedy").

*Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 578 (2d Cir. 2006).*

> Since *Varity Corp. v. Howe, supra, 516 U.S. at 512,* was decided, some United States Courts of Appeals have held that a claim for breach [*47] of fiduciary duty under *ERISA Section 502(a)(3)* is precluded where a claim lies under other provisions of *Section 502,* such as *502(a)(1)(B)*. See *Belluardo v. Cox Enters., Inc., 157 F. App'x 823, 829 (6th Cir. 2005); Ford v. MCI Commc'ns Corp. Health & Welfare Plan, 399 F.3d 1076, 1082-83 (9th Cir. 2005)*. However, the Second Circuit has "per- mitted plaintiffs to pursue breach of fiduciary duty claims under both *ERISA § 502(a)(1)(B)* and *§ 502(a)(3)* under certain circumstances." *Keir v. Unumprovident Corp., 02 Civ. 8781 (DLC), 2010 U.S. Dist. LEXIS 95560, 2010 WL 3566878 at *7 (S.D.N.Y. Sept. 14, 2010)* (Cote, D.J.), citing *Frommert v. Conkright, 433 F.3d 254, 272 (2d Cir. 2006);* and *Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 89-90 (2d Cir. 2001)*.

The United States Supreme Court has also held that *Section 502(a)(3)* is limited to "'those categories of relief that were typically available in equity.'" *Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209-10, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002)* (emphasis in original), quoting *Mertens v. Hewitt Assocs., 508 U.S. 248, 256, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993).* Where a plaintiff is "seeking legal relief - the imposition of personal liability on [a defendant] for a contractual obligation to pay money -- *§ 502(a)(3)* [*48] does not authorize [the] action." *Great-West Life & Annuity Ins. Co. v. Knudson, supra, 534 U.S. at 221.*

> *ERISA Section 502(a)(3)*
>
> authorizes solely equitable relief, and under the Supreme Court's decision in *Great-West, supra,* this means that money awards are available in suits brought un- der *§ 502(a)(3)* "only in very limited cir- cumstances." *Gerosa v. Savasta & Co., 329 F.3d 317, 321 (2d Cir. 2003);* see also *Great-West, 534 U.S. at 211, 122 S. Ct. 708* ("Those rare cases in which a court of equity would decree specific performance of a contract to transfer funds were suits that, unlike the present case, sought to prevent future losses that either were in- calculable or would be greater than the sum awarded.").

*Wilkins v. Mason Tenders Dist. Council Pension Fund, supra, 445 F.3d at 578-79* (emphasis in original).

> The Supreme Court has delineated what forms of equitable restitution are available under *§ 502(a)(3)*, distinguish- ing permissible forms of equitable restitu- tion such as employment of a constructive trust or of an equitable lien from forms of legal restitution. [*Great-West Life & An- nuity Ins. Co. v. Knudson, supra, 534 U.S. at 213.*] Thus, a constructive trust or eq- uitable lien is imposed [*49] when, "in the eyes of equity," a plaintiff is "the true owner" of funds or property, and the "money or property identified as belong- ing in good conscience to the plaintiff [can] clearly be traced back to particular funds or property in the defendant's pos- session." Id.

*Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 103 (2d Cir. 2005).*

In Sereboff v. Mid Atl. Med. Servs., Inc., the United States Supreme Court "made clear that *section 502(a)(3)* requires both that the 'basis for [the] claim' and the 'nature of the recovery' sought be equitable." *Coan v. Kaufman, 457 F.3d 250, 264 (2d Cir. 2006)*, quoting *547 U.S. 356, 362-363, 126 S. Ct. 1869, 164 L. Ed. 2d 612 (2006)* (emphasis in original). Thus, the Second Circuit has held that "[e]ven if breach of fiduciary duty is an equitable claim . . . remedies for breach of that fiduciary duty do not constitute 'equitable relief' under *section 502(a)(3)* unless the plaintiff seeks a 'categor[y] of relief that [was] typically available in equity.'" *Coan v. Kaufman, supra, 457 F.3d at 264*, quoting *Mertens v. Hewitt Assocs., supra, 508 U.S. at 256* (emphasis omitted); *Fisher v. Penn Traffic Co., 319 F. App'x 34, 35 (2d Cir. 2009)*, cert. denied, ___ U.S. ___, 130 S. Ct. 494, 175 L. Ed. 2d 376 (2009).

The [*50] Second Circuit has repeatedly upheld dismissals of claims for breach of fiduciary duty under *ERISA Section 502(a)(3)* that sought monetary damages. *Hall v. Kodak Ret. Income Plan, 363 F. App'x 103, 107 (2d Cir. 2010)* ("To the extent [plaintiff's] claim is that she is entitled to an annuity pursuant to the terms of the Plan . . . such relief is clearly legal rather than equitable and is therefore not available under *§ 502(a)(3)*."); *Fisher v. Penn Traffic Co., supra, 319 F. App'x at 35; Krauss v. Oxford Health Plans, Inc., supra, 517 F.3d at 630; Coan v. Kaufman, supra, 457 F.3d at 264* ("[T]he alternative relief [plaintiff] seeks under *section 502(a)(3)*, an injunction requiring the defendants to restore funds to the defunct 401(k) plan to be distributed to former participants, 'does not transform what is effectively a money damages request into equitable relief.' . . . [Plaintiff's] attempt to cast this action as one for 'equitable relief' therefore fails" (citation omitted)); *Yoon v. Fordham Univ. Faculty & Admin. Ret. Plan, 173 F. App'x 936, 941 (2d Cir. 2006)* ("[Plaintiff's] *Section 502(a)(3)* claims . . . fail because they are inherently legal rather than equitable in nature. . . . [*51] [Plaintiff's] 'prayer for declaratory relief is merely a prelude to a claim for damages.' . . . The same is true of his request that the court order [defendant] to make past-due contributions to his pension plan . . . ." (citation omitted)); *Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 103-04 (2d Cir. 2005)* ("the language of [plaintiff's] request for relief involves words of contract rather than those of equity, a circumstance that undermines her claim that the district court misconstrued the nature of the relief that she has sought. ").

However, in *Frommert v. Conkright, supra, 433 F.3d at 272*, the Second Circuit rejected a district court's holding "that all of the relief sought by the plaintiffs in their claim for breach of fiduciary duties can be adequately addressed by the relief available under *§ 502(a)(1)(B)*." In *Turcotte v. Blue Cross & Blue Shield of*

*Mass., Inc., 07 Civ. 4023 (RJS), 2008 U.S. Dist. LEXIS 86807, 2008 WL 4615903 at \*5 (S.D.N.Y. Oct. 14, 2008)*, the Honorable Richard J. Sullivan, United States District Judge, discussed the Second Circuit's holding in *Frommert v. Conkright, supra*, stating that

[i]n *Frommert* . . . the Second Circuit . . . directed the district court to 'determine what appropriate [*52] relief is necessary' were plaintiffs to prevail on their breach of fiduciary duty claim. *433 F.3d at 272* (internal quotations omitted). In essence, this language from Frommert simply stands for the proposition that relief under both *§ 1132(a)(1)(B)* and *1132(a)(3)* is not per se unavailable. The precise form of relief Plaintiffs seek here, however, has already been deemed to be a legal, not equitable, remedy under the Second Circuit's decision in Nechis. See *421 F.3d at 104*. Indeed, the Frommert court expressly rejected plaintiffs' claim for equitable relief to pursue payment of benefits, noting that '[w]hile plaintiffs seek to expand the nature of their claim by couching it in equitable terms to allow relief under *[§ 1132(a)(3)]*, the gravamen of this action remains a claim for monetary compensation, and that, above all else, dictates the relief available.' *Frommert, 433 F.3d at 270*.

Here, I conclude that plaintiff's breach of fiduciary duty claims under *ERISA Section 502(a)(3)* do not seek appropriate equitable relief, because her claims seek the recovery of Plan benefits and/or damages, i.e., money. Plaintiff's *Section 502(a)(3)* claims are indistinguishable from her *Section 502(a)(1)(B)* [*53] claims to recover Plan benefits (see Amend. Compl. ¶¶ 19, 33, 40, 49). In plaintiff's Amended Complaint, her claims against Met-Life and United repeatedly refer to either "benefits" or "damages," and no reference is made the imposition of a constructive trust or equitable lien. Furthermore, plaintiff does not allege that she is the true owner of segregated, identifiable funds in MetLife or United's possession. Thus, the nature of the remedy she seeks is legal, and not equitable. See *Turcotte v. Blue Cross & Blue Shield of Mass., Inc., supra, 2008 U.S. Dist. LEXIS 86807, 2008 WL 4615903 at \*5*. The fact that plaintiff also requests other relief -- a de novo standard of review and presumption of an exhaustion of administrative remedies -- does not change this analysis. See *Coan v. Kaufman, supra, 457 F.3d at 264; Yoon v. Fordham Univ. Faculty &*

*Admin. Ret. Plan, supra, 173 F. App'x at 941*. Plaintiff's claims, at heart, seek a financial remedy.

Finally, to the extent plaintiff's claim that MetLife denied her a full and fair review could be considered under *ERISA Section 503(2), 29 U.S.C. § 1133(2)*, I nevertheless conclude that she is not entitled to relief on this claim, either. See *Krauss v. Oxford Health Plans, Inc., supra, 517 F.3d at 630* [*54] (citations omitted); *Giordano v. Thomson, 564 F.3d 163, 168 n.3 (2d Cir. 2009)*. *Section 503(2)* states that "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." A full and fair review "concerns a beneficiary's procedural rights, for which the typical remedy is remand for further administrative review." *Krauss v. Oxford Health Plans, Inc., supra, 517 F.3d at 630* (citations omitted); *Giordano v. Thomson, 564 F.3d 163, 168 n.3 (2d Cir. 2009)*; *Gregory v. Metro. Life Ins. Co., 648 F. Supp. 2d 591, 599 (D. Vt. 2009)*. However, where remand would be futile, it is not necessary. *Krauss v. Oxford Health Plans, Inc., supra, 517 F.3d at 630* (citation omitted); *Giordano v. Thomson, supra, 564 F.3d at 168 n.3*. While plaintiff expressly argues that remand would be futile (Pl.'s Mem. at 29), I must independently analyze this issue.

When plaintiff challenged the payment of benefits to Edward D. Wagner's children and provided more information and documentation with each subsequent letter, MetLife evaluated her information, reconsidered [*55] the record and informed her of its decision. While MetLife continuously denied the claim, the administrative record supports the conclusion that it performed a thorough review. Based on this history, I conclude that if the matter were remanded, MetLife would continue to maintain its position that its payment discharged its liability pursuant to the Plan's terms, and that the payment was made in good faith without notice of a competing claim. In other words, remand here would be a "useless formality." *Krauss v. Oxford Health Plans, Inc., supra, 517 F.3d at 630*, quoting *Miller v. United Welfare Fund, supra, 72 F.3d at 1071*. For these reasons, I conclude that plaintiff is not entitled to any appropriate equitable relief for breach of fiduciary duty, and I respectfully recommend that summary judgment for MetLife and United be granted on this issue.

## E. Attorney's Fees

Plaintiff also seeks attorney's fees as a separate claim against MetLife and United. MetLife and United argue that plaintiff's request for attorney's fees is "premature and unsustainable" because she has not achieved any success on her claims (Defs.' Mem. at 18-19).

An application for attorney's fees in an ERISA action is governed [*56] by *29 U.S.C. § 1132(g)*, which provides:

> In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

A litigant "must show 'some degree of success on the merits' before a court may award attorney's fees under *§ 1132(g)(1)*." *Hardt v. Reliance Standard Life Ins. Co., U.S. , 130 S. Ct. 2149, 2158, 176 L. Ed. 2d 998 (2010)*, quoting *Ruckelshaus v. Sierra Club, 463 U.S. 680, 694, 103 S. Ct. 3274, 77 L. Ed. 2d 938 (1983)*; *Kelly v. Handy & Harman, supra, 406 Fed. Appx. 538, 2011 WL 159601 at *2*. Because plaintiff has shown no success on the merits, I recommend that her motion for summary judgment be denied and that United and MetLife's motion for summary judgment be granted.

## F. Motion to Strike

MetLife and United also move to strike various documents submitted by plaintiff in support of her motion for summary judgment. Because I have not considered any of these documents identified by MetLife and United, I recommend that this motion be denied as moot.

## IV. Conclusion

Accordingly, I respectfully recommend that MetLife and United's motion for summary judgment (Docket Item 42) be granted, plaintiff's cross-motion for summary judgment (Docket [*57] Items 36, 47) be denied and MetLife and United's motion to strike (Docket Items 52) be denied as moot.

## V. Objections

Pursuant to *28 U.S.C. § 636(b)(1)(C)* and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties shall have fourteen (14) days from receipt of this Report to file written objections. See also *Fed. R. Civ. P. 6(a)*. Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable George B. Daniels, United States District Judge, 500 Pearl Street, Room 630, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Daniels. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRE-

2011 U.S. Dist. LEXIS 74954, *

CLUDE APPELLATE REVIEW. *Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-238 (2d Cir. 1983).*

Dated:   [*58] New York, New York

February 28, 2011

Respectfully submitted,

/s/ Henry Pitman

HENRY PITMAN

United States Magistrate Judge